**ANHEUSER–BUSCH, INC.,**
Plaintiff–Appellee,

v.

**NATURAL BEVERAGE DISTRIBUTORS,**
d/b/a Mendocino Coast Distributing Co.;
Florence M. Beardslee, Defendants–Appellants.

No. 93–17335.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 9, 1995.

Decided Oct. 27, 1995.

Richard D. Rosenberg, Alioto & Alioto, San Francisco, California, for defendants-appellants.

Timothy E. Carr, Carr & Mussman, San Francisco, California; Carmine R. Zarlenga, Howrey & Simon, Washington, D.C., for plaintiff-appellee.

Before: CHOY, POOLE, and KLEINFELD, Circuit Judges.

## OPINION

CHOY, Circuit Judge:

Ms. Florence Beardslee and Natural Beverage Distributors (collectively "Beardslee") appeal the district court's Orders granting partial summary judgment to plaintiff Anheuser–Busch, Inc. ("Anheuser"), ordering a new trial on her counterclaim against Anheuser, and ultimately dismissing her counterclaim. We affirm all three rulings.

### I.

For many years, Beardslee solely-owned and operated Natural Beverage, a wholesale distributorship for Anheuser. Relations between Anheuser and all of its wholesale distributors are governed by a written agreement called the "Anheuser–Busch, Inc. Wholesaler Equity Agreement" (the "Agreement"). Beardslee entered into the Agreement with Anheuser in late 1984. This appeal emanates from litigation surrounding Anheuser's termination of Beardslee's distributorship in 1989.

*The Successor–Manager Nomination*

Under the Agreement, Beardslee is required to designate a "Successor–Manager," subject to Anheuser's approval, who is capable of taking over the business in the event that the manager no longer can perform his or her duties. Anheuser may not unreasonably withhold its approval of the proposed

individual. In the event that Anheuser does not approve a proposed Successor–Manager, Anheuser must notify Beardslee and Beardslee is required to submit promptly an additional Successor–Manager application or to obtain a waiver of the application. If after ninety days from the date Beardslee receives notice of Anheuser's disapproval Beardslee does not submit an application acceptable to Anheuser, Beardslee has another ninety days in which to sell her business as a going concern. Should Beardslee fail to sell the business, the Agreement automatically terminates and Anheuser will compensate Beardslee in a certain amount. This is what happened here.

On October 26, 1988, Beardslee hand-delivered to Greg Fleischut, the Anheuser District Manager assigned to Natural Beverage, an application nominating her daughter, Shawna D. Beardslee, for the position of Successor–Manager. At the time Beardslee submitted the application, Shawna had just turned 18 years old and was attending college, where she was studying fashion design and merchandising. On November 23, 1988, Anheuser informed Beardslee by letter that it was exercising its right under the Agreement to disapprove of Shawna's selection as a Successor–Manager because she lacked experience and knowledge in relevant fields. In particular, Anheuser explained:

> Our reasons for disapproval include Shawna's lack of management experience in the areas of sales, marketing, operations, and financing. Additionally, Shawna's knowledge of the beer industry, and of business in general, is limited.

Letter from Tom Sobbe to Florence M. Beardslee (Nov. 23, 1988). The letter also informed Beardslee that she had ninety days in which to obtain Anheuser's approval of a qualified Successor–Manager.

When Beardslee did not name another Successor–Manager within the designated time frame, Anheuser notified Beardslee that she had ninety days in which to sell Natural Beverage and that if she did not sell the company, the Agreement would terminate. Anheuser voluntarily extended the time period by an additional sixty days. The district court further provided Beardslee with another thirty days by enjoining Anheuser from terminating the Agreement. In total, Beardslee was given six months in which to sell National Beverage.

On March 8, 1989, the litigation from which this appeal sprang commenced. Anheuser filed an action seeking a declaratory judgment that it would be acting consistently with the terms of the Agreement if it terminated Beardslee's distributorship in the event that Beardslee did not sell Natural Beverage as a going concern within the allotted period.

Beardslee notified Anheuser that she intended to sell the distributorship to Bruce and Jan McKinney and, on March 15, 1989, she signed a purchase contract with the McKinneys who had offered $1,150,000 for the business. Anheuser claims its financial analysis of the proposed sale revealed that the McKinneys would not have had a sufficient cashflow to operate the business and to make the necessary investments the Agreement required. Anheuser based its financial analysis on Natural Beverage's performance in 1988. Beardslee subsequently presented Anheuser with revised proposals. In one, the purchase price was to be $750,000 and the McKinneys were to lease rather than purchase Beardslee's warehouse. Two days after receiving this proposal, Anheuser wrote to Beardslee indicating it needed further information before it could begin reviewing the proposal. Anheuser claims Beardslee never responded to its request for additional information.

On August 11, 1989, Anheuser proposed to Beardslee eight alternative sale arrangements that it would approve between Beardslee and McKinney. Beardslee rejected the proposals.

On August 25, 1989, Beardslee brought a counterclaim against Anheuser, alleging that Anheuser breached the Agreement by withholding unreasonably its approval of Shawna's selection as Successor–Manager and claiming Anheuser tortiously interfered with her contractual relations with the McKinneys. This counterclaim later went to trial.

On August 28, 1989, Anheuser terminated Beardslee's distributorship.

In late December of 1989, the district court granted partial summary judgment in Anheuser's favor, finding that Anheuser acted within its rights under the Agreement in refusing to approve of Shawna as a Successor–Manager. Beardslee appeals this ruling.

### The Natural Beverage Warehouse Fire

On December 10, 1989, a fire burned Beardslee's Natural Beverage warehouse in which Beardslee kept her financial records for the company.[1] In the days and weeks following the fire, detectives from the Fort Bragg Police Department (the "FBPD") and agents from the Bureau of Alcohol, Tobacco, and Firearms (the "Bureau") visited the warehouse. FBPD Detective Les Pierce visited the scene within two days of the fire and observed "salvageable documents." Later, on January 4, 1990, Bureau Agents Joseph Stafford and Darren Gil executed a search warrant on the warehouse. They seized eight filing cabinets containing business records and seven cardboard boxes filled with documents. Stafford noticed that some of the documents were legible. As will be more fully discussed in Part C of this Opinion, it is clear that shortly after the fire Beardslee knew that the documents survived in legible form and that they were in police custody.

### The Publicity Order

When an article disparaging Anheuser in connection with the lawsuit appeared in a newspaper, the district court orally admonished Beardslee and ordered her to refrain from "engaging in out of court mail publicity communications that are designed to disparage Anheuser." The district court stressed that the case should be decided on its merits in the courtroom, not in newspapers or in the mail.

Despite the district court's Order that Beardslee refrain from publicizing the litigation with Anheuser, Beardslee agreed to be interviewed at length by several publications. When five or six newspaper articles about the case subsequently appeared, the district court held another hearing on October 12, 1989, to clarify its prior ruling. Although the district court found that Beardslee was not in violation of the letter of its Order, which only specifically referred to mail publicity, he concluded she was "certainly ... in violation of the spirit of what I intended." The district court found that Beardslee's behavior was "a clear and blatant violation of the intent of the court's comments on July 25" and warned that it would not countenance her violating its Orders. The district court then made it clear that the Publicity Order covered *all* communications with the media.[2] In January of 1992, during the trial on Beardslee's counterclaim, it came to the court's attention that Beardslee had written a letter dated May 8, 1990, containing allegations against Anheuser addressed to several publications, to the television program, "20/20," to the California Insurance Commissioner, to the ACLU, and to several other organizations and individuals. To investigate the matter, the district court judge questioned Beardslee. Beardslee stated under oath that she sent the letter only to the California Insurance Board and to her insurance agent. She claimed that she listed the other parties on the letter in order to get the attention of the insurance concerns. The district court stated that it considered dismissing the case or declaring a mistrial for violating its Order, but apparently did not because Beardslee denied sending the letter to the media. The district court sternly warned Beardslee that serious consequences would flow from deceiving it.

After a second trial had been ordered and before it took place, in July of 1992, Beardslee again violated the district court's Publicity Order; she was interviewed at length on a

---

1. In particular, Beardslee had stored in the warehouse the following Natural Beverage financial records: invoices, business statements from suppliers and vendors, daily account journals for accounts payable and receivable, financial statements and accounting reports, telephone bills, utility bills, bank deposit receipts and monthly statements, W–2 forms, truck drivers' expense receipts, and officers' and employees' expense receipts.

2. In full, the district court ordered:

> [I]t's the Order of this court that all parties to the case and their respective counsel, and agents and representatives, that they are enjoined and restrained from discussing this matter with any representative of any of the media pending further Order of this court or final adjudication on the merits.

syndicated radio talk show, called the "Tom Valentine Show," in which she discussed all phases of the litigation with Anheuser in detail. During that interview, Beardslee made numerous inflammatory allegations against Anheuser and implied that Anheuser was responsible for the fire in her warehouse.

*The Discovery Order*

On June 18, 1991, after discovery on Beardslee's counterclaim was formally closed, the district court granted Anheuser's motion to reopen discovery. Noting "significant discrepancies" in Beardslee's testimony and documents submitted as to Natural Beverage's 1988 income, and observing that the profitability of the business was a central issue in the case, the district court ordered Beardslee to produce within seven days copies of tax returns for her businesses for the years 1987, 1988, and 1989. The Discovery Order also provided Anheuser with three months in which to serve interrogatories and document requests requiring Beardslee to describe each element of income or expense in her tax returns and requiring production of supporting documentation. Anheuser was also permitted to depose Beardslee and her accountant on particular issues.

In the Discovery Order, the district court determined that the verity of Beardslee's financial disclosures thus far appeared questionable and sternly warned Beardslee that it would not tolerate deceptive behavior. The district court cautioned:

> Taken together, these items [documents and testimony regarding Natural Beverage's 1988 finances obtained from Beardslee through discovery] paint a picture of inconsistency which this court considers to be deeply troubling. To be blunt, it is difficult to conceive of an accounting system under which all of the facts just outlined could be true....
>
> Most importantly, ... there would be a substantial prejudice to the system of justice and this court's integrity if a litigant were permitted to mislead the court. This court does not find at this time that defendants have engaged in dishonest conduct. However, there emerges a startling lack of clarity and a possibility of impropriety

which must be addressed. Where, as here, a party seeking relief bears the burden of proving a fact, the type of obdurate behavior exhibited by defendant Beardslee at her deposition appears highly inappropriate. While this court does not now make a finding of wrongdoing, let the parties and their attorneys read these words and be warned.

In sworn responses to discovery requests and during her deposition conducted pursuant to the court's Discovery Order, Beardslee repeatedly claimed that every single document in her warehouse had been destroyed in the fire in December 1989.

*The Trial on the Counterclaim and the New Trial Order*

The liability portion of Beardslee's counterclaim was tried to a jury in January and February of 1992. The jury found for Beardslee on the issue of liability.

On April 21, 1992, before the damages phase of the trial commenced, however, the district court granted Anheuser's motion for a new trial, finding that Beardslee had repeatedly presented to the jury evidence that it had previously ruled to be inadmissible and that much of the evidence Beardslee presented was more prejudicial than probative. A re-trial was scheduled to commence in January of 1993. Beardslee appeals this decision.

*Beardslee Retrieves the Natural Beverage Documents*

In April of 1992, Beardslee asked her friend Tony Stanford to go to the Fort Bragg Police Department to pick up documents that were legible from 1987 forward. Stanford retrieved six boxes of documents from the Fort Bragg Police Department on April 21, 1992. These six boxes represented only a fraction of the documents that were stored at the Fort Bragg Police Department.

Beardslee has admitted that soon after Stanford picked up the documents, he told her that he had retrieved legible documents. Yet, it was not until October that Beardslee finally obtained the documents from Stanford.

Finally, in the first week of October, 1992, nearly six months after Stanford picked up

the documents, Stanford delivered the documents to Beardslee. Shortly before the re-trial was set to begin, on October 28, 1992, Beardslee's counsel notified Anheuser that he was producing some documents that had been only "recently returned" to Beardslee. Anheuser subpoenaed the documents that still remained at Fort Bragg, some of which the district court subsequently found were relevant to the litigation.

*The Order Dismissing Beardslee's Counterclaim*

In the wake of this revelation, Anheuser moved to dismiss Beardslee's counterclaim, arguing that Beardslee had long known that the Natural Beverage documents survived the fire and had repeatedly lied to Anheuser and the court about their alleged destruction. After holding an extensive evidentiary hearing, at which fifteen witnesses testified over four days, the district court granted Anheuser's motion to dismiss Beardlsee's counterclaim on September 9, 1993.

## II.

### A. SUMMARY JUDGMENT

In granting partial summary judgment in Anheuser's favor, the district court held that Anheuser had acted within its rights under the Agreement in enforcing the Successor–Manager provision. Specifically, the district court found that it was reasonable for Anheuser to withhold its approval of Shawna because she was unqualified for the position. Because Beardslee did not comply with the Agreement's requirement that she nominate a qualified Successor–Manager, the district court held that Anheuser was entitled under the Agreement to require Beardslee to sell the distributorship.

 Beardslee urges that in so ruling, the district court ignored disputed issues of fact.[3] We review a district court's grant of summary judgment *de novo*. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). Our task is to determine, viewing the evidence in the light most favorable to the non-moving party, whether there exist genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* A material fact is one which might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To preclude summary judgment, the dispute about a material fact must also be "genuine," such that a reasonable jury could find in favor of the non-moving party. *Id.*

The Agreement requires that Beardslee select a qualified Successor–Manager of whom Anheuser approves. Pursuant to the Agreement, Anheuser "shall not unreasonably withhold its approval" of the candidate and subsequently has the power to withdraw its approval "for good cause." As stated in the Agreement, the purpose of the Successor–Manager provisions is to ensure that if the Manager becomes unable to or ceases to manage the distributorship, a competent individual capable of managing the business will be available to assume the role.

Viewing the evidence in the light most favorable to Beardslee, we agree with the district court that there exists no genuine dispute of material fact as to whether Anheuser acted within its contractual rights in

**3.** Beardslee also maintains that Shawna was "automatically approved" as a Successor–Manager because Anheuser did not notify Beardslee that it disapproved of Shawna's serving in that role until after the 30–day period specified in the Agreement had elapsed. This contention is unavailing. The relevant provision provides that:

Within 30 days after the date of the *receipt* of the Successor–Manager Application ... Anheuser–Busch shall notify Wholesaler whether it does or does not approve the person whom Wholesaler desires to designate as Successor–Manager.... Failure of Anheuser–Busch to notify Wholesaler within said time shall auto-

matically constitute approval of the Successor–Manager.

Agreement, Ex. 3 (emphasis added). Beardslee argues that she sent the application naming Shawna as co-Successor-Manager on October 18, 1988, but that Anheuser did not notify her of its disapproval until November 23, 1988. However, Fleischut's undisputed testimony demonstrates that Beardslee handed him the application on October 26, 1988, and there is no evidence that Anheuser received the application prior to that date. Thus, it is evident that Anheuser notified Beardslee of its disapproval within the 30–day period required for response.

withholding its approval of Shawna's nomination and in enforcing the Agreement.

### Shawna's Qualifications

 Beardslee failed to raise a genuine issue as to the reasonableness of Anheuser's conclusion that Shawna was unqualified to serve as Successor–Manager. Our review of the record confirms the district court's finding that "[t]here is no indication in the record that Shawna Beardslee possesses the skill necessary to be a Successor–Manager." It is undisputed that at the time she was nominated, Shawna was a teenaged full-time college student attending a school hundreds of miles away in Southern California, where she was majoring in fashion design and merchandising. Beardslee claimed that Shawna had been involved in the distributorship some years before, but some years before Shawna would have been a small child. The record supports the conclusion that it was not unreasonable for Anheuser to withhold approval of Shawna's nomination in light of her lack of management experience and relevant knowledge.

### "Co"–Successor–Managers

Indeed, implicitly acknowledging that Shawna was not qualified for the position of Successor–Manager at the time she was nominated, Beardslee maintains that Anheuser had approved "co"-Successor–Managers and that Beardslee had "at least one" qualified successor-manager at all times. Beardslee concedes that she did not intend for Shawna to immediately take over the business, rather Shawna was to work with a co-Successor–Manager, Everett White, to manage the business. Beardslee contends that Anheuser had previously approved of her nominating co-Successor–Managers and that there is at least a question of fact on this issue. If such approval were given, it would likely be material to the reasonableness of Anheuser's refusal in 1988 to approve Shawna's application.

The district court considered and rejected this co-Successor–Manager argument, finding "this allegation is completely refuted by documentary evidence clearly indicating that plaintiff never agreed to, nor ratified, co-Successor–Managers." We come to the same conclusion.

As an initial matter, nowhere in the Agreement is the designation of more than one Successor–Manager authorized; to the contrary, the Agreement repeatedly refers to "a Successor–Manager" in the singular. Thus, the terms of the Agreement indicate that Anheuser would not approve co-Successor–Managers.

And as a matter of practice, there is no *genuine* dispute that Anheuser ever approved co-Successor–Managers. Beardslee contends that White was a co-Successor–Manager with her ex-husband, Archie Meno, in 1984. At the very least, Beardslee claims that Anheuser had constructive knowledge that White was named as co-Successor–Manager. These contentions lack support in the record.

First of all, there is no evidence that White was ever accepted by Anheuser as a co-Successor–Manager. To the contrary, Dolores Lyoch, Anheuser's manager of Wholesaler Agreement Operations, averred that Anheuser never approved of Beardslee appointing more than one Successor–Manager. After reviewing the Agreement submitted by Beardslee in 1984, Lyoch noticed that Beardslee had written two names in the space provided for her Successor–Manager designation. When Anheuser signed the Agreement on January 27, 1985, a duplicate original was sent via certified mail to Beardslee on February 5, 1985 with a letter attached confirming that only Archie Meno was approved as successor-manager and clearly rejecting the nomination of two people: she wrote, "we are unable to approve more than one individual as a Successor–Manager at a given time." The letter also notified Beardslee that Anheuser's files would continue to reflect only *Archie Meno* as the approved Successor–Manager. Beardslee does not dispute that this letter was received by Natural Beverage.

Beardslee supports her argument that White was a co-Successor–Manager with his declaration. At most, however, White's declaration reveals his subjective belief that he was appointed co-Successor–Manager with Archie Meno and then with Shawna Beard-

slee. Such a belief does not establish that Anheuser approved of White sharing the Successor–Manager designation.

The undisputed evidence reveals that Anheuser never approved White as a co-Successor–Manager and informed Natural Beverage of this fact from the outset. Anheuser's express rejection of White as a co-Successor–Manager disposes of Beardslee's contention that Anheuser "tacitly" approved of his serving in this capacity.

*Intent and Motive*

Beardslee also asserts that Anheuser's intent and motive underlying its denial of approval are key disputed issues and that therefore summary judgment is inappropriate. Beardslee contends that Anheuser used the Successor–Manager provision as a "pretext" to terminate her distributorship.

At the outset, it is unclear to us why Anheuser's intent would be material to whether it breached its contractual promise to not withhold approval unreasonably. Here, as Beardslee essentially concedes, the evidence reveals that Shawna was not qualified for the position of Successor–Manager. Thus, it was reasonable for Anheuser to withhold its approval of Shawna's nomination, regardless of whether Anheuser may have had other reasons for so doing.

But even if Anheuser's intent and motive constitute facts material to this litigation, Beardslee had the burden of coming forward with evidence to demonstrate that there is a *genuine* dispute as to Anheuser's intent in refusing Shawna as a Successor–Manager. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Beardslee has not carried this burden.

By a letter, submitted with Anheuser's summary judgment motion, Anheuser provided Beardslee with a well-founded list of reasons as to why Shawna was not qualified to serve as a Successor–Manager. In addition, with its summary judgment motion, Anheuser submitted the declaration of Anheuser Division Manager, Robert Signorelli,

who relates that he recommended that Shawna not be approved because of her inexperience. The only evidence Beardslee mustered to support her argument is the deposition testimony of Bruce McKinney, who had also sued Anheuser for interfering with his attempt to buy Beardslee's distributorship. McKinney testified that, in his opinion, Anheuser used the Successor–Manager provision as an excuse to terminate Beardslee's distributorship. McKinney conceded that he "assumed" this was the case from a conversation he had with Signorelli. Assuming, *arguendo,* that McKinney's testimony as to what Signorelli told him could be considered by the district court in ruling on the summary judgment motion,[4] McKinney's testimony fails to raise a genuine issue as to Anheuser's intent. Such conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment. *See, e.g., Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49 (2d Cir.1985); *Thornhill Publishing Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). On the basis of McKinney's testimony, a reasonable factfinder could not decide that Anheuser used the Successor–Manager provision as a pretext to terminate Beardslee. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A fair-minded trier of fact could not reasonably conclude that Anheuser unreasonably withheld its approval. *See id.,* 477 U.S. at 252, 106 S.Ct. at 2512. Accordingly, summary judgment was appropriate.

**B. NEW TRIAL**

The district court granted Anheuser's motion for a new trial, finding that Beardslee had repeatedly presented to the jury prejudicial testimony and argument on subjects which the court had ruled to be inadmissible such that the jury was influenced by passion and prejudice in reaching its verdict. The district court also concluded that much of Beardslee's evidence was more prejudicial than probative. The district court granted a new trial "[f]or these and other reasons...."

---

4. In general, inadmissible hearsay evidence may not be considered on a motion for summary judgment. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 667 (9th Cir.1980). Although Anheuser contends that McKinney's testimony

regarding Singorelli's statement is inadmissible hearsay, Beardslee did not respond to this argument in her briefs or at oral argument. The district court did not specifically address Signorelli's testimony or rule as to its admissibility.

#### 1.

■ The district court's grant of a new trial is reviewed for an abuse of discretion. *Kehr v. Smith Barney, Harris Upham & Co.,* 736 F.2d 1283, 1286 (9th Cir.1984). In conducting this review, we note that the trial court is in a superior position to gauge the prejudicial impact of counsel's conduct during the trial. *Id.* We will not disturb the district court's ruling unless we have a "definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached...." *Henry v. Gill Indus., Inc.,* 983 F.2d 943, 946 (9th Cir.1993) (citation omitted). We find that the district court acted well within its discretion in granting Anheuser's motion for a new trial.

■ A new trial is warranted on the ground of attorney misconduct during the trial where the " 'flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.' " *Kehr,* 736 F.2d at 1286 (quoting *Standard Oil Co. of California v. Perkins,* 347 F.2d 379, 388 (9th Cir.1965)). Where misconduct permeates the proceeding, the jury is "necessarily prejudiced." *Id.* "[C]onstant objections are certainly not required, as they could antagonize the jury...." *Id.*

#### 2.

■ Beardslee denies that she introduced evidence in violation of the district court's *in limine* rulings, but contends that even if she did, any prejudice which may have resulted was insignificant. Anheuser counters that Beardslee introduced excluded and inflammatory evidence throughout the trial, that such evidence was highly suspect if not a complete fabrication, and that Beardslee's misconduct was highly prejudicial.[5]

The district court's conclusion that Beardslee repeatedly violated its *in limine* rulings

finds ample support in the record. For example, the district court ruled unambiguously that evidence relating to prospective purchasers of Beardslee's distributorship, other than the McKinneys, was inadmissible. At the hearing on the *in limine* motion, Beardslee told the court her purpose in introducing evidence of other prospective purchasers' experience with Anheuser was to demonstrate that Anheuser had an improper motive in disapproving of the sale to the McKinneys. This alleged improper motive was that Anheuser only wanted to sell distributorships to friends and employees. To this, the district court responded:

> If you have someone who will testify that Anheuser–Busch said, "We only award distributorships to our friends, and you're not one of our friends," I think that would be admissible, *but I don't want to get into the nature or details of any prospective buyers of Beardslee's distributorship....*
>
> . . . . .
>
> ... I don't want to get into any prospective other purchases, deals.

Beardslee did not appeal this ruling.

Nonetheless, Beardslee presented at the trial, over Anheuser's repeated objections, evidence that prospective purchasers had contacted her, that she had received "many offers" to buy the distributorship, and that Anheuser was "interfering with contracts" to sell the distributorship. In particular, when Beardslee's counsel inquired into a prospective purchaser in 1985—"And Pease was somebody who was interested in buying your [business], was he?"—Beardslee responded, "Yes. He had presented over a million dollar offer." Even after Anheuser's objection was made and sustained, Beardslee again stated "he had made a full million dollar offer...." Moreover, Beardslee's counsel introduced the inadmissible evidence in his cross-examination of an Anheuser employee: "[I]n your

---

5. Anheuser further contends that we may affirm the new trial grant on the basis of Beardslee's misconduct in suppressing relevant documents— a fact which was revealed subsequent to the new trial order. *See Jones,* 921 F.2d at 879 ("Failure to disclose or produce materials requested in discovery can constitute 'misconduct' within the

purview of [Fed.R.Civ.P. 60(b)(3)]....") (quoting *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988)). We need not address this contention, as there is ample support for the new trial grant on the basis of Beardslee's conduct during the trial alone.

analysis of the fair market value, did you have in mind that Ms. Beardslee had been offered in excess of a million dollars by a number of potential buyers?" In sum, it is clear that Beardslee's counsel repeatedly and impermissibly elicited testimony and made reference to matters previously ruled inadmissible "with the sole purpose of bringing to the jury something it should not have heard." *County of Maricopa v. Maberry,* 555 F.2d 207, 219 (9th Cir.1977).

Nor can we agree with Beardslee that the evidence she presented in violation of the district court's *in limine* ruling was not prejudicial to Anheuser. The testimony elicited in violation of the court's ruling left the jury with the unrebutted impression that Anheuser had for years wrongfully interfered with offers from numerous purchasers to buy Beardslee's business. Because references to prospective purchasers and to the details of potential sales were excluded by the court's ruling, Anheuser did not present evidence to rebut the inference Beardslee had created. Anheuser was thus in the untenable situation that the district court had sought to avoid in its *in limine* ruling. As the court stated during the trial:

> [I]f you go in just a little bit into another potential transaction of Beardslee's, *you create the impression that Anheuser-Busch acted in an arbitrary fashion.... Then he [Anheuser] has to be allowed to present countervailing evidence that they did conduct an examination, that they did look into it, that they did study it and examine it, and we're going to be trying that potential transaction in this case.*

(emphasis added).

Moreover, in his closing argument, Beardslee's counsel used the inadmissible evidence in an inflammatory manner. For example, after discussing Anheuser's alleged rejection of other prospective purchasers, he exclaimed: "In some other context, they would call this kind of stuff extortion. Or Attempted Extortion. In light of these offers."

It also appears that at least some of Beardslee's testimony at trial regarding offers from other individuals was false. For example, Beardslee and her counsel made repeated references during the trial to a purported offer in 1983 by Orion Burkhardt, then an executive of Anheuser, to purchase Natural Beverage for $1.4 million. Mr. Burkhardt has declared that he never made such an offer to Beardslee. Such references during trial to an offer that did not exist are highly prejudicial, while lacking in probative value.[6]

The district court's new trial decision was also supported by its finding that evidence was presented to the jury throughout the trial whose probative value was substantially outweighed by its prejudicial effect. The district court did not specify to which evidence it was referring, but Anheuser points to numerous examples. At trial, Beardslee made allegations that Anheuser engaged in sexist and racist behavior and mistreated and harassed her despite the fact that the district court had ruled that the evidence of business harassment Beardslee sought to introduce was irrelevant.

In light of the pervasive improprieties committed by Beardslee's counsel, Beardslee has not and cannot demonstrate that the district court committed a clear error of judgment in ordering a new trial on her counterclaim.

---

**6.** Beardslee claims that Anheuser's reliance on her tax returns at trial "outweighed" any prejudice that Anheuser suffered as a result of her misconduct during the trial. There is no merit to this contention. Beardslee's tax returns were the most relevant record of Natural Beverage's finances available to Anheuser at the time and the distributorship's profitability was at issue in the trial. Moreover, Beardslee's claim that "the tax fraud scheme was the highlight of A[nheuser]'s closing argument" is simply inaccurate. Anheuser's closing argument spans fifty pages of the transcript. At one point, Anheuser's counsel recounted that Anheuser's employee performing the financial analysis, Ms. Overfelt, was told by Beardslee that she should remove expenses for personal items from Beardslee's financial statements. The argument recalls that Beardslee would not indicate to Overfelt in writing which of the expenses should be taken out because she was "concerned about getting in trouble with the IRS." There is no support for Beardslee's claim that Anheuser's "sole purpose for introducing the tax returns during the trial was to prejudice the jury against Ms. Beardslee." Appellants' Opening Brief at 42.

## C. DISMISSAL

Invoking its inherent power and the authority of Rule 37 of the Federal Rules of Civil Procedure, the district court granted Anheuser's motion to dismiss Beardslee's counterclaim with prejudice. In a thorough opinion, the district court found that Beardslee concealed the Natural Beverage documents for three years and continuously lied about their existence and condition under penalty of perjury. The district court observed that Beardslee had willfully and in bad faith violated the rules of discovery by withholding the documents from Anheuser and had repeatedly violated its pretrial Publicity Order. Concluding from Beardslee's repeated behavior that she will "say anything at any time in order to prevail in this litigation[,]" the district court found it had no choice but to dismiss her counterclaim.

### 1.

■ A dismissal pursuant to the court's inherent power and Rule 37 is reviewed for an abuse of discretion. *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir.1988). The district court's factual findings may not be set aside unless they are clearly erroneous. *See* Fed.R.Civ.P. 52; *Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir.1983). In particular, the district court's credibility determinations are entitled to special deference. *See e.g., EEOC v. Bruno's Restaurant*, 13 F.3d 285, 289 (9th Cir. 1993).

We find that the district court acted well within its discretion in dismissing Beardslee's counterclaim pursuant to its inherent power. We therefore need not address whether dismissal was appropriate under the alternate authority of Rule 37.

### 2.

■ Before imposing the harsh sanction of dismissal, the district court must weigh several factors:

(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Henry,* 983 F.2d at 948 (citations omitted). For dismissal to be proper, the conduct to be sanctioned must be due to " 'willfulness, fault, or bad faith.' " *Id.* at 946 (quoting *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1337 (9th Cir.1985)). Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression "threaten[s] to interfere with the rightful decision of the case." *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 591 (9th Cir.1983); *see also Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.,* 682 F.2d 802, 806 (9th Cir.1982) (holding default entry violated due process where the sanctioned party's deception was wholly unrelated to the merits of the controversy). In evaluating the propriety of dismissal, we consider all incidents of Beardslee's alleged misconduct. *See Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1411 (9th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991).

■ It is well settled that dismissal is warranted where, as here, a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle,* 709 F.2d at 589 (upholding dismissal of complaint pursuant to court's inherent power where plaintiff's denials of material fact were knowingly false and plaintiff willfully failed to comply with discovery orders); *see also Combs v. Rockwell Int'l Corp.,* 927 F.2d 486 (9th Cir.1991) (affirming dismissal under the court's inherent power as appropriate sanction for falsifying a deposition), *cert. denied,* 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); *Halaco Eng'g Co.,* 843 F.2d at 380 (reversing dismissal where alleged misconduct peripheral to merits of case, but observing, "[d]ismissal under a court's inherent powers is justified ... in response to abusive litigation practices ... and to insure the orderly administration of justice and the integrity of the court's orders."); *North Am. Watch Corp. v. Princess*

*Ermine Jewels,* 786 F.2d 1447, 1451 (9th Cir.1986) (affirming dismissal of defendant's counterclaim under court's inherent power for concealing documents and violating court's discovery order); *Phoceene Sous–Marine, S.A.,* 682 F.2d at 806 (noting "[i]t is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders[,]" but reversing entry of default because the deception was "peripheral" to the merits of the controversy).

### 3.

*Beardslee Knew That the Natural Beverage Documents Survived the Fire In Legible Form*

 On the basis of considerable evidence, the district court found that Beardslee knew almost immediately after the fire that the Natural Beverage documents survived in legible form and that her avowals to the contrary were not credible:

> Beardslee's story is utterly devoid of credibility ...
>
> . . . . .
>
> Beardslee's testimony is flatly contradictory to the testimony of several law enforcement officials who have no motive to lie and whose testimony is frequently buttressed by contemporaneous business records made by them. Beardslee's testimony is also at times in conflict with other statements made by her.

On appeal, Beardslee challenges this finding and proclaims that there is no evidence that she knew that the Natural Beverage documents survived the fire in legible form prior to October of 1992. Beardslee maintains that she immediately notified Anheuser once she became aware that the documents existed and might be relevant to the litigation. The overwhelming evidence is to the contrary.

As Beardslee vigorously disputes the district court's findings, we review the evidence in some detail. The record reveals the following sordid tale. In the days following the fire, Beardslee inspected the warehouse. Two days after the fire, on December 12, 1989, Beardslee told Bureau Agent Gil that most of her business and employee related documents were "still in the building" where the fire occurred. This statement is memorialized in Agent Gil's search warrant affidavit. At the very least, this statement reveals that Beardslee's inspection informed her that the documents still existed. Bureau Agent Stafford testified that he informed Beardslee that her documents were in the possession of the Fort Bragg Police. On January 11, 1990, during a taped interview with Stafford and FBPD Detective James Grant, Beardslee asked them if they took her files in addition to her file cabinets. Her exact words were: "When you took the files. Did you take the file cabinets, too, *or just the files?* " (emphasis added). Beardslee thus knew that the FBPD possessed Natural Beverage documents.

Further comments Beardslee made during the taped interview indicate that she was aware not only that the police had the documents, but also that the documents were not completely burned. In explaining why she did not believe the fire was an "inside job," she insisted: "those file cabinets aren't going to burn. They're all metal. So it wasn't anybody with keys that wanted to do it for any documents." After this interview, Stafford testified he took Beardslee to the garage area of the Fort Bragg Police Department, where she viewed the records.

In late December or early January of 1990, FBPD Detective Les Pierce called Beardslee to inform her that business documents had been salvaged from the warehouse and were being stored at a police facility. Pierce related the conversation as follows:

> Ms. Beardslee responded that she would need the documents for tax purposes and requested that they be returned to her.... Over the next several weeks [in January 1989], Ms. Beardslee repeatedly called me to request the return of her documents so that she could use them for tax purposes.

It is hard to understand why Beardslee would need the documents for tax purposes unless she knew that they were legible; illegible documents would not be useful for tax purposes.

Moreover, Beardslee saw the documents for a second time. Detective Pierce testified that in early 1990 he took Beardslee to the storage facility where the documents were stored. In his words: "I showed Ms. Beardslee several multi-drawer file cabinets in which the documents were located. I even opened one drawer *to show her that the documents were legible.*" (emphasis added). Beardslee admits that Pierce showed her a drawer of documents.

Then, in December of 1991, Bureau Agent David Lierz called Beardslee to inform her that her files would be returned to her if she executed a release form. Agent Lierz specifically told Beardslee that he had her business records. Although Agent Lierz had no knowledge as to the condition of the documents at the time he spoke with Beardslee, Beardslee nevertheless responded that she would like to obtain the documents. Accordingly, on or about December 30, 1991, Lierz both faxed and Federal Expressed to Beardslee a release form.

On the evening of January 27, 1992, in the midst of the trial, Agent Lierz again called Beardslee requesting that she sign the release form. Beardslee replied that she did not want to send the release form until after the conclusion of the trial because if she had the documents in her possession, she might have to produce them to Anheuser. This statement implies that she believed the documents to be legible, as illegible documents would be useless to Anheuser in discovery.

In February of 1992, Agent Lierz attempted to contact Beardslee on several occasions. Agent Lierz finally received the signed release form from Beardslee on March 5, 1992, after Beardslee had told him that she needed the documents for an IRS audit. Again, why would Beardslee need the documents for an IRS audit if they were illegible, as she claims she believed?

It was not until April of 1992, after Anheuser's motion for a new trial was granted, that Beardslee sought to obtain the documents. She sent her friend Tony Stanford to pick up, as Stanford related, "documents that were legible from '87 forward...." Yet again, Beardslee's own statements contradict her claim that she did not know that the surviving documents were legible.

This evidence leads inexorably to the conclusion reached by the district court—that Beardslee knew almost immediately after the fire that the Natural Beverage documents survived in legible form.

*Beardslee Concealed and Lied About the Existence of the Documents*

Despite her knowledge to the contrary, Beardslee repeatedly lied to Anheuser and to the court throughout every phase of this litigation—throughout discovery, her opposition to Anheuser's discovery motion, her opposition to Anheuser's summary judgment motion, the trial, and at the evidentiary hearing—claiming that the Natural Beverage documents had been destroyed. As we found in a similar case, "[t]he record supports the finding that [her] ... denials were knowingly false." *Wyle,* 709 F.2d at 590. For example, in her opposition to Anheuser's motion to conduct additional discovery, Beardslee claimed, falsely:

Anheuser–Busch has been provided every existing piece of paper in the custody and control of Natural Beverage Distributors concerning their accounts, income made, products carried, and expenses incurred.

In her deposition conducted pursuant to the court's Discovery Order, Beardslee testified repeatedly under oath that all of the documents stored at the warehouse were destroyed. Similarly, in response to Anheuser's second request for production of documents, Beardslee claimed:

The records kept by Florence Beardslee in Mendocino at her warehouse with the information requested were destroyed. Key records for Florence M. Beardslee's business expenses for Mendocino Coast Distributors Company, Inc. and Natural Beverage Distributors were destroyed in the fire....

In her opposition to Anheuser's application for leave to file a motion for summary judgment on Beardslee's counterclaim, Beardslee again stated:

What has not and cannot be produced are the documents burned in the December 1989 fire of the Natural Beverage

Warehouse. All documents have been produced to Tim Carr, Esq. Nothing has been withheld....

．　　．　　．　　．　　．

Not only has all documentation responsive to this Order been provided, every single piece of paper that Florence M. Beardslee has still in her custody or possession or custody or possession of Michael Owen has been provided.

Most egregiously, the very day after Beardslee told Agent Lierz that she would not sign a release form for the documents until after the trial because she feared she would have to produce the documents, Beardslee testified at the trial that the Natural Beverage records had burned in the fire:

> Q. But did you ever provide backup documentation of any sort? For example, invoices that would show why it was the figure on your financial statement is not the correct figure?
>
> A. No. Would you like me to explain why I didn't?
>
> Q. Sure. Please do.
>
> A. I was never asked for any back-up documentation until after the fire occurred, *which destroyed the back up documents.*

These statements were outright falsehoods. Beardslee's attempt to minimize the egregiousness of her misconduct by characterizing her statements as "hypberole" is incredible.

*The Documents Beardslee Concealed Were Relevant to Discovery Requests*

Having failed to convince the district court that she did not know that the Natural Beverage documents survived the fire in legible form, Beardslee now contends on appeal that she did not know that the concealed documents were relevant to the litigation, and that even if she did, the documents were not the subject of discovery requests. It is hard to view this argument as anything but disingenuous. In its Order dismissing Beardslee's counterclaim, the district court specifically noted that there was no dispute that the

Natural Beverage documents were the subject of discovery requests.

Nevertheless, there is ample evidence in the record to demonstrate that Beardslee knew that the Natural Beverage documents were relevant to the litigation and were comprised within Anheuser's discovery requests. For example, when Agent Lierz called Beardslee on January 27, 1992, requesting that she sign a release form for the documents, she responded that she did not want to obtain the documents until after the trial because if she had them in her possession she might have to produce them to Anheuser. The district court found Lierz's testimony regarding this conversation to be both credible and supported by contemporaneous documentation. Moreover, in sworn testimony Beardslee has admitted that the 1988 documents were crucial to Anheuser's case "because they were the original load sheets and bank deposits and invoices from '88, which was the year the whole trial was all about." Specifically, Beardslee's response to interrogatories propounded pursuant to the Discovery Order reveals her knowledge that the Natural Beverage documents were directly relevant to Anheuser's discovery requests. Anheuser had requested documents supporting items in Beardslee's and Natural Beverage's tax returns. In response, Beardslee stated:

> Key financial records used in the preparation of tax returns for Florence M. Beardslee ... and Natural Beverage Distributors were destroyed in a fire.... These financial records constituted the bulk of the documentation relied upon in the preparation of the tax return entries which are the subject of these interrogatories....

．　　．　　．　　．　　．

> The above described missing financial records, which were destroyed in the warehouse fire, *were the only records which could have been referenced to provide a more complete and more specific response to these interrogatories.*

(emphasis added).[7] In her opposition to Anheuser's motion to conduct limited discovery

---

**7.** Beardslee concedes that in July of 1991, pursuant to the Discovery Order, Anheuser requested

that she produce every document that supported her tax returns for 1987, 1988 and 1989. But

and to continue the trial date, Beardslee stated: "The only discovery documents which Anheuser–Busch has been precluded from obtaining are: ... any documentation destroyed in the fire of December, 1989." And in her opposition to Anheuser's motion to conduct additional discovery, filed May 10, 1991, Beardslee claimed, falsely:

> Anheuser–Busch has been provided every existing piece of paper in the custody and control of Natural Beverage Distributors concerning their accounts, income made, products carried, and expenses incurred....
>
> . . . . .
>
> The tax returns for Mendocino Coast Distributing, Inc. and Natural Beverage Distributors have all been turned over to Anheuser–Busch. The supporting documents for these tax returns have all been turned over.

It is clear from Beardslee's own statements that she knew that the Natural Beverage documents were not only relevant to the litigation, but were also comprised within Anheuser's discovery requests.

### 4.

Beardslee contends on appeal that dismissing her counterclaim was an inappropriate sanction because the court failed to consider lesser sanctions and because Anheuser suffered no prejudice from her late production of documents. Anheuser responds that the district court did consider less severe sanctions, but found that lesser sanctions would not be effective. Anheuser argues that a showing of prejudice is not required, but that even if it were, prejudice was amply demonstrated.

### The District Court Adequately Considered Lesser Sanctions

■ In determining whether a district court has properly considered the adequacy of less drastic sanctions before dismissing a party's case, we consider (1) whether the district court explicitly discussed the feasibil-

ity of less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2) whether the district court implemented alternative sanctions before ordering dismissal; and (3) whether the district court warned the party of the possibility of dismissal before ordering dismissal. *Adriana Int'l Corp.*, 913 F.2d at 1412–13.

■ Here, the district court explicitly discussed the feasibility of less drastic sanctions, but concluded that any sanction less than dismissal would be ineffective. In light of Beardslee's concealment of the documents for three years, her continuous denials under oath that she knew the documents existed and were legible, her repeated violations of the court's Publicity Order, and her violations of the court's *in limine* rulings, there is ample support for the district court's conclusion that Beardslee's behavior illustrated such "an abiding contempt and continuing disregard for this court's orders" that dismissal was the only real alternative. As the district court explained:

> Beardslee does not take her oath to tell the truth seriously and ... will say anything at any time in order to prevail in this litigation. There is little guarantee that if the court were to impose lesser sanctions Beardslee's misconduct would cease.

Beardslee's pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available. It is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct. *See, e.g., TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir.1987); *Chism v. Nat'l Heritage Life Ins. Co.*, 637 F.2d 1328, 1332 (9th Cir. 1981).

■ Beardslee also contends that before exercising its inherent power to dismiss a party's case, the district court is required to clearly warn the party by identifying the party's action that will lead to the sanction of dismissal. Selectively looking only to the district court's warnings stemming from her

---

she argues that the documents in the warehouse were not used to prepare the returns and that therefore they are not responsive to the request. This claim, however, is directly contradicted by

the above quoted response to interrogatories. Moreover, Anheuser's document request broadly sought items "supporting" Beardslee's tax returns, not merely items used in their preparation.

conduct in violation of the Publicity Order, Beardslee contends that the district court did not sufficiently warn her that her conduct that ultimately led to dismissal might lead to such a sanction. In other words, Beardslee argues that dismissal was too harsh a sanction because the district court did not warn her that if she concealed documents and lied about their existence to the court that her case might be dismissed. We disagree.

We have specifically stated "an explicit warning is not always necessary." *Adriana Int'l Corp.*, 913 F.2d at 1413; *see also Malone v. United States Postal Serv.*, 833 F.2d 128 (9th Cir.1987), *cert. denied,* 488 U.S. 819, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988). Nevertheless, in this case, the district court *did* explicitly warn Beardslee that discovery misconduct or violating its orders could result in serious repercussions, including dismissal.[8] In particular, in its Discovery Order the district court made it patently clear that deceitful conduct in the course of discovery would lead to serious repercussions. Significantly, the district court's warning in its Discovery Order incorporated the benchmark for dismissal pursuant to the court's inherent power: "there would be a substantial prejudice to the system of justice and this court's integrity if a litigant were permitted to mislead the court."

In addition, the district court sternly cautioned Beardslee that she must abide by its pre-trial Publicity Order: "there are few things that anger a Judge more than a refusal to abide by a Court Order...." In the course of its warnings to Beardslee, the district court specifically stated that it had considered dismissing the case as a sanction for her misconduct. For instance, upon learning during the trial of the letter which Beardslee had addressed to a broad spectrum of media representatives, the district court declared: "mistrial appeared to me at that time to be the appropriate remedy.... I'm not going to dismiss, I'm not going to declare a mistrial ... at this time ... [T]he next time ... I'm not going to fail to do anything." Given

these warnings, Beardslee can hardly be surprised that the court dismissed her case.

*As the District Court Found, Anheuser Suffered Actual Prejudice From Beardslee's Suppression of the Documents*

Beardslee also argues that it was an abuse of discretion to dismiss her case because Anheuser suffered no prejudice from the production of documents; indeed, she contends that the Natural Beverage documents support her case, rather than Anheuser's defense. Anheuser counters that a demonstration of prejudice may not be required in this circuit, but that even if it were, the district court's finding that Anheuser was prejudiced by Beardslee's misconduct was correct.

Admittedly, the decisions of this circuit send conflicting signals as to whether prejudice to the party moving for dismissal must be demonstrated for dismissal to be considered an appropriate sanction pursuant to the court's inherent power. While some opinions refer to prejudice as "purely optional" and "not required ... but an important factor," other opinions describe prejudice as a "key factor" and "essential." *Compare, Halaco Eng'g,* 843 F.2d at 382 (finding prejudice factor is "purely optional"), *United States v. Nat'l Medical Enters., Inc.,* 792 F.2d 906, 912–913 (9th Cir.1986) (stating prejudice is not required for dismissal), *and Combs,* 927 F.2d at 486 (upholding dismissal for falsification of deposition testimony with no explicit consideration of prejudice), *with Henry,* 983 F.2d at 948 (referring to prejudice as a "key factor"), *Wanderer v. Johnston,* 910 F.2d 652, 656 (9th Cir.1990) (stating that the element of prejudice is "essential"), *and Adriana Int'l Corp.,* 913 F.2d at 1412 (holding where a court order is violated, prejudice and availability of less drastic sanctions are the decisive factors).

We decline to enter the fray over whether legal prejudice to the party seeking the dismissal is or is not required. The record supports the district court's conclusion that Anheuser was prejudiced by Beardslee's suppression of the Natural Beverage documents. " '[A] defendant suffers prejudice if the plain-

---

**8.** Of course, the district court could not have specifically warned Beardslee that if she concealed and lied about the existence of the Natural

Beverage documents it would dismiss her case because Beardslee represented to the court that the documents had been destroyed.

tiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case.'" *Henry,* 983 F.2d at 948 (quoting *Adriana Int'l Corp.,* 913 F.2d at 1412). The district court found that Anheuser's ability to defend itself at trial in 1992 was "severely impaired" by Beardslee's failure to produce the Natural Beverage documents "because it forced Anheuser to rely on incomplete and spotty evidence in presenting its financial analysis of Natural Beverage for 1988." We accord substantial deference to the district court's finding that Anheuser's defense was impaired as, having presided over the trial, the district court judge is in the best position to assess prejudice.

The record supports the conclusion that Anheuser's defense was prejudiced by the concealment of the documents. Anheuser lost the trial. The Natural Beverage documents stored in the warehouse were important to supporting Anheuser's defense. While Beardslee claimed that Anheuser unreasonably withheld its approval of Beardslee's sale of the distributorship to the McKinneys, Anheuser maintained, on the basis of its financial analysis, that the distributorship did not generate sufficient income for the McKinneys to meet their financial obligations. At trial, Anheuser used 1988 as the base year of its financial analysis of Natural Beverage. Beardslee's claim at trial was that Anheuser's financial reason was merely pretextual and attacked Anheuser's financial analysis. Not having the underlying documentation, Anheuser was forced to rely on Beardslee's tax returns at trial to support its defense. At trial, Beardslee repeatedly attacked the foundation and methodology of Anheuser's analysis of the 1988 sales and consistently maintained that Anheuser had used an incorrect 1988 sales figure. Anheuser could have used the invoices at trial to support the accuracy of its financial analysis, to buttress the credibility of its expert, and to challenge Beardslee's testimony and the testimony of her expert.

The district court rejected Beardslee's argument that the documents support her version of Natural Beverage's finances. Whether or not the documents would have changed the outcome of the trial is not the issue in determining prejudice. It is sufficient that Beardslee's concealment of the documents clearly impaired Anheuser's ability to go to trial and *threatened* to interfere with the rightful decision of the case. *Henry,* 983 F.2d at 948. Nonetheless, it is appropriate to presume that where documents relevant to the merits of the litigation have been concealed the deception casts doubt on the concealing party's case. *See, e.g., Phoceene Sous-Marine, S.A.,* 682 F.2d at 806.

Beardslee's argument that because she "voluntarily" produced the documents to Anheuser it is not reasonable to infer that the documents hurt her case is not persuasive given the district court's finding that she intentionally concealed the documents for three years and then when she did inform Anheuser that the documents existed, she produced only part of them. Anheuser had to subpoena the rest.

Additionally, tendering documents after the first trial and one or two months before the second trial was to begin cannot cure the prejudice to Anheuser. This court has squarely rejected the notion that a failure to comply with the rules of discovery is purged by belated compliance. *Henry,* 983 F.2d at 947; *see also North Am. Watch Corp.,* 786 F.2d at 1451 (holding "[l]ast-minute tender of documents does not cure the prejudice to opponents nor does it restore to other litigants on a crowded docket the opportunity to use the courts."); *G–K Properties v. Redevelopment Agency of San Jose,* 577 F.2d 645, 647–48 (9th Cir.1978) (holding "last minute tender" of relevant documents does not cure effects of discovery misconduct).

The trial judge's conclusion that Beardslee "will say anything in order to prevail" regardless of her path, and that "[t]here is little guarantee ... Beardslee's misconduct would cease" addresses the future prejudice as well as past misconduct. Where a party has lied and hidden evidence so extensively, a judge may find, as the district judge in this case did, that a subsequent trial offers no assurance of a reliable result. There was no reason to be confident that the whole truth would be revealed in the second trial, and every

reason to infer from her conduct, that Beardslee would continue to deceive with regard to any matter on which she had not been caught.

Accordingly, even if prejudice to Anheuser were a condition necessary to dismissing Beardslee's case, prejudice was established.

*The Dismissal Comported With the Requirements of Due Process*

█ Because there is a close nexus between Beardslee's misconduct and the merits of her case, due process concerns are not implicated. As in *Wyle*, 709 F.2d at 591, Beardslee's actionable misconduct consisted of falsely denying the existence of and suppressing information that was clearly relevant to Anheuser's defense. *Id.* Thus, from Beardslee's deception regarding the documents "one may reasonably infer" that her "case is lacking in merit." *Phoceene Sous-Marine, S.A.*, 682 F.2d at 806 (citing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 349–54, 29 S.Ct. 370, 379–81, 53 L.Ed. 530 (1909)).

In light of Beardslee's egregious misconduct which prejudiced Anheuser and cast doubt on the merits of her case, the district court acted clearly within its discretion in dismissing her counterclaim.

### III.

We AFFIRM the district court's rulings granting partial summary judgment in Anheuser's favor, ordering a new trial on Beardslee's counterclaim, and ultimately dismissing Beardslee's counterclaim.

AFFIRMED.