**GRASON ELECTRIC COMPANY, Amos J. Walker, Inc., Rex Moore Electrical Co., Inc., et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 89–70470.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1991.

Decided Dec. 18, 1991.

Wendy A. Cheit and Mark R. Thierman, Thierman, Cook, Brown & Prager, San Francisco, Cal., for petitioners.

Corinna Lothar Metcalf, N.L.R.B., Washington, D.C., for respondent.

Before GOODWIN, THOMPSON and O'SCANNLAIN, Circuit Judges.

GOODWIN, Circuit Judge:

Six employer members of a multiemployer association (hereinafter NECA) were prevailing parties in an unfair labor practice case brought against them by the National Labor Relations Board. They challenge the Board's refusal to award attorney fees under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504(a)(1) (1988).

■ The statute provides that "[a]n agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses...." The statute goes on to provide that the award shall be granted unless "the position of the agency was substantially justified or that special circumstances make an award unjust." 5 U.S.C. § 504(a)(1). Thus, the agency does not have discretion to deny attorney fees; the award is mandatory unless an exception applies or unless a party fails to qualify. In response to this petition for review, the Board argues that these petitioners fall within an exception and therefore are not entitled to any attorney fees.

The EAJA grew out of Congress' concern that the high costs of litigation might deter small entities from vindicating their rights when faced with adverse action by a federal agency. See H.R.Rep. No. 1418, 96th Cong., 2d Sess. (1980) *reprinted in*

1980 U.S.Code Cong. & Admin.News 4953, 4984, 4988–89. To further its purpose, the Act specifies that it applies only to businesses whose net worth does not exceed $7 million and which do not employ more than 500 people. 5 U.S.C. § 504(b)(1)(B). The statute further provides that "[a]fter consultation with the Chairman of the Administrative Conference of the United States, each agency shall by rule establish uniform procedures for the submission and consideration of applications for an award of fees and other expenses." 5 U.S.C. § 504(c)(1).

The NLRB regulations provide that "[t]he net worth and number of employees of the applicant *and all of its affiliates* shall be aggregated to determine eligibility." 29 C.F.R. § 102.143(g) (1991) (emphasis added). The regulation further states that "financial relationships of the applicant other than those described in this paragraph may constitute special circumstances that would make an award unjust." *Id.*

Here, the Board argues that because the litigation was financed by all NECA members, not just the parties to this appeal, the Board should aggregate the assets of all NECA companies in determining eligibility. Each of the parties to this appeal would individually qualify for fees under the Act. But because NECA refused to provide financial data for all 48 NECA members, the Board assumed that if aggregated, the total assets would exceed $7 million and found that the petitioners had failed to establish their eligibility.

Petitioners argue that the Board exceeded its statutory authority in issuing this regulation, because the statute makes no mention of aggregating affiliates for purposes of the maximum dollar and work force limits on eligibility. Petitioners further argue that the Board's approach to other financial relationships also exceeds the statutory authority, because the Board misinterprets the meaning of "special circumstances." Finally, petitioners argue that even if the regulation is valid, it does not permit aggregation in this case, because the six parties do not meet the regulation's definition of affiliates. According-

ly, petitioners assert that the financial relationship in this case does not constitute a special circumstance that would make an award "unjust."

The Board affirmed the conclusion of the Administrative Law Judge which aggregated the net worth of the NECA members. Because it affirmed on this ground, the Board declined to reach the ALJ's conclusions that the General Counsel had not been substantially justified in issuing the complaint. (The complaint was issued on the basis of a bureaucratic failure to correct a defective computer-generated list of potential violators.)

## I. *Substantial Justification*

The Board argues that since it only addressed the "special circumstances" prong of 5 U.S.C. § 504(a)(1) below, the "substantial justification" issue is not ripe. The Board's reliance on the ripeness doctrine is misplaced.

The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The doctrine is concerned with "the fitness of [an] issue[ ] for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

■ This case involves an agency pressing groundless claims without checking the facts and maintaining these claims even after being notified of its error. This case does not turn on a fact-intensive investigation of whether "substantial" justification underlay the Board's decision to press its claims against petitioners. In this case, there was *no* justification.

Thus, the substantial justification issue here poses no problem of fitness for judicial review, nor of entanglement with the

Board's policy-making. The ripeness doctrine does not apply.

## II. *Validity of the Regulation.*

### A. *Aggregation of Affiliates*

In reaching its decision, the ALJ (and the Board in affirming the ALJ) relied on the "other financial relationships" language of the NLRB regulation, not the regulatory language concerning specific affiliates. Accordingly, we need not reach the petitioners' arguments that the parties here do not meet the definition of "affiliates" under the regulation.

### B. *Other Financial Relationships*

■ The ALJ held that the net worth of all 48 NECA members should be aggregated for purposes of determining eligibility for attorney fees, based on the members' "joint participation in the conduct which gave rise to the adversary adjudication and the joint participation in the litigation (and payment thereof)." The ALJ found that even though the NECA members were not affiliates, their net worth should be pooled because they had combined their resources to finance this litigation. (The six small employers sought the help of their association to defend the unwarranted claims.) The ALJ held that Congress' purpose was only to provide fees to parties who could not easily afford legal services. Because NECA was able to afford legal services by pooling its resources, the ALJ held that it would be "unjust" to award the six employers attorney fees.

#### 1. *Special Circumstances*

■ Petitioners argue that the legislative history, as well as case law, show that the statute's "special circumstances" language was intended to refer only to substantive issues, not financial eligibility. This argument has merit.

The House Report discusses the "special circumstances" language only in the context of legal issues. The Judiciary Committee discusses the test of substantial justification and states that if the government fails to make this showing, "fees should be awarded unless some other circumstances make an award unjust." 1980 U.S.Code Cong. & Admin.News at 4992. The Committee goes on to state that that language "protects the government when its case ... has a reasonable basis in law and fact. Furthermore, it provides a safety valve where unusual circumstances dictate that the government is advancing in good faith a credible, though novel, rule of law." *Id.* at 4993.

The Report nowhere mentions financial circumstances, other than those spelled out in the statute, as a "special circumstance" that could defeat an award. Indeed, the Report expresses Congress' concern about "the natural reluctance of agencies to award fees against themselves," *id.* at 4993, and explains that this concern led Congress to reject a purely discretionary standard for awarding fees. *Id.* at 4992–93.

The only two Ninth Circuit cases cited by either party discuss "special circumstances" in the context of legal issues. *See Animal Lovers Volunteer Ass'n v. Carlucci,* 867 F.2d 1224, 1226 (9th Cir.1989) (finding no special circumstances because "[t]he litigation on the merits did not involve a close or novel question"); *United States v. Gavilan Joint Community College Dist.,* 849 F.2d 1246, 1249 (9th Cir. 1988) (finding no special circumstances that would permit denial of an award because the case did not involve a novel but credible interpretation of law, an issue on which reasonable minds could differ, or an important and doubtful question). However, neither of these cases raised the issue of "unusual financial" circumstances. In both cases, the "special circumstances" language was raised in the context of legal questions. While these cases do not hold that a court could never find a financial situation to be a "special circumstance," they addressed the matter only as a question involving the strength of the government's case.

The Board admits that there is a "dearth of case law" interpreting the "special circumstances" exception. It cites two of its own cases that aggregated assets. But

they did so under the specific "affiliate" provisions of the rule, not the general "other financial relationships" language. *See Noel Produce, Inc.,* 273 N.L.R.B. 769 (1984) (aggregating the assets of a parent and its subsidiary); *Kut–Kwick Corp.,* 273 N.L.R.B. 838 (1984), *aff'd without op.,* 770 F.2d 173 (11th Cir.1985) (aggregating assets of a majority stockholder with those of applicant's parent company).

Finally, the Board relies on *Pacific Coast Metal Trades Council,* 295 N.L.R.B. No. 24, 131 L.R.R.M. 1692 (1989). In *Pacific Coast Metal,* the Board found that the assets of a trades council should be aggregated with those of its constituent members for the purpose of determining net worth. The Board stated that "the Applicants' structure and function is analogous to that of a multiemployer collective-bargaining association whose individual members' assets and net worth are aggregated with the association's for the purpose of determining the association's eligibility for an EAJA award, when the organization is controlled directly or indirectly by its members." *Id.,* 131 L.R.R.M. at 1695.

The pending case does involve a multiemployer collective bargaining association. However, because such an association was not at issue in *Pacific Coast Metal,* the Board's statement has no force in this case. Further, *Pacific Coast Metal* provides no authority for its statement that the assets of such an association should be aggregated. It cites no cases where such assets have ever been aggregated, nor does it cite any statutory or regulatory authority for this proposition. Therefore, we must look elsewhere for authority.

The Board also relies on the history of the 1985 amendments to the EAJA. The Board notes that the 1985 amendments made no changes designed to alter the "affiliate" or "financial relationships" language of the model rules. However, this omission could have occurred simply because there had been no cases in which courts had denied eligibility based on the "financial relationships" language of the regulation. The only pre–1985 case cited by either party that denied eligibility did so

on the basis of a parent/subsidiary relationship. *See Noel Produce, Inc.,* 273 N.L.R.B. 769 (1984). This relationship is quite different from the relationship between companies that are competitors but belong to the same trade association.

Indeed, Congress specifically criticized the courts for taking too narrow a view of the Act. Congress noted that agencies had awarded far less in attorney fees than Congress had estimated would occur when it had passed the original legislation. *See* H.R.Rep. No. 120, 99th Cong., 1st Sess., pt. 1 (1985) *reprinted in* 1985 U.S.Code Cong. & Admin.News 132, 137. Congress noted that part of the reason the awards were much lower than Congress had expected was that "agencies and courts are misconstruing the Act." *Id.* The Committee complains that agencies and courts are construing the Act too narrowly in several contexts. *Id.* at 137–39. While the report does not discuss the particular regulatory language at issue here, it is clear that when it re-authorized the legislation, Congress believed that courts and agencies were being too parsimonious, rather than too generous. In the only section of the report to discuss the limitation on the net worth of parties, Congress rejected the Board's action · in aggregating the net worth of a local union with the international union with which the local is affiliated. *See id.* at 145–46.

The ALJ acknowledged that Congress had rejected the NLRB's holdings in two cases involving this issue, including an earlier version of the *Pacific Coast Metal* case.

■ The Committee report indicates that aggregation may be proper in some limited circumstances:

It is the Committee's intent that if the local union is considered to be a separate labor organization for purposes of the Labor Management Reporting and Disclosure Act of 1959, it should be considered to be a separate organization for purposes of the EAJA as well, and the local's entitlement of fees should be determined without regard to the assets

and/or employees of the international union with which the local is affiliated. 1985 U.S.Code Cong. & Admin.News at 146. Thus, the report implies that if the union is *not* considered a separate organization under the LMRDA, its assets *could* be aggregated with those of the international. But the report makes clear that if the LMRDA treats the two as separate organizations, the Board may not aggregate their assets. The Report provides no room for the Board to conduct its own examination of the relationship between the local and the international either in general or for purposes of the litigation at issue. Thus, if the Board's position remains that it will aggregate assets where a union and its international participate in "group litigation" (as stated by the ALJ), despite the fact that they are considered separate under the LMRDA, this position would be in clear violation of congressional intent.

While the Board cannot show legislative history or case law that rejects its position on "special circumstances," it likewise can show no authority in support of its position.

We turn to the next argument advanced by the Board.

### III. *Application of the Regulation*

The Board is seeking to aggregate the net worth of every member of NECA in order to determine the eligibility of six members for attorney fees. As discussed below, the Board does have grounds to argue that all parties who are liable for the fees are the "real parties in interest." However, it is not at all clear that it is correct to aggregate the net worth of all such parties, and deny fees to all of them if their total net worth exceeds the statutory limits for "a party." This type of formula is not employed in civil rights or environmental litigation.

The parties in this case appear to have set up a kind of litigation insurance policy, in which they share the costs of litigation that involves any one member or group of members. The Board seems to be arguing that if a party was a member of a group legal plan, government agencies should be exempt from paying attorney fees if the assets of *every* party who contributed to that plan, aggregated together, exceeded the statutory limits for the assets of "a party."

It is true that Congress' purpose was to protect small entities who could not otherwise afford the costs of contesting government actions against them. But it seems contrary to general policies, applicable in areas such as medical insurance, to deny fees to such parties where, because of their inability to afford legal costs, they have arranged to participate in a type of insurance plan. It would be closer to legislative intent to allow these prevailing parties to recover their fees, and thereby reduce or refund any special assessments made by the association. Denying fees to such associations would increase the costs to the individual members. The record indicates that special assessments were made against the businesses involved in this plan. Thus, the mere participation in a group legal defense plan does not mean that these small businesses are thereby free from the costs of litigation. Payment by assessment is still payment.

In *Unification Church v. I.N.S.*, 762 F.2d 1077, 1081–83 (D.C.Cir.1985), the court relied on the general history of "real party in interest" analysis to determine that such an analysis was appropriate in that case. The court further determined that because Congress' concern in passing the EAJA was to protect small entities who might not be able to afford the costs of litigation, the court should infer a congressional intent not to subsidize large entities who could easily afford legal services. The court held that to effectuate this concern, it should conduct a "real party in interest" analysis. *Id.* at 1081–82. The court held that since the sole issue in litigation over attorney fees is who will pay those fees, the real party in interest is the party who would pay the fees in the absence of an attorney fees award. *Id.* at 1082. The court held that it could properly examine fee arrangements *between clients* (as opposed to fee agreements between an attorney and a client). *Id.* at 1083. The court noted that

in *Unification Church,* none of the named plaintiffs would pay *any* fees in the absence of a fee award; the church had agreed to assume *all* liability for the fees. Therefore, the court looked solely to the eligibility of the church under the statute's requirements. *Id.* at 1082–83.

The Board cites several other cases that rely on *Unification Church* to determine the real party in interest based on who would be liable for attorney fees in the absence of a fee award. *See Wall Indus. v. United States,* 15 Cl.Ct. 796, 803–06 (1988), *aff'd,* 883 F.2d 1027 (Fed.Cir.1989); *In re Davis,* 91 B.R. 627, 632 (Bankr. M.D.Ga.1988), *vacated,* 899 F.2d 1136, 1145 (11th Cir.1990). But these cases have little, if any application here where each of the small entities has been assessed its share of the fees and the association merely "fronts" the costs and then collects from the members.

The petitioners have each requested a fraction of the total costs of the litigation in which they were the prevailing parties. However, it appears that the costs of this litigation were borne by all 48 members of NECA. Thus, the "real parties in interest" would appear to be all 48 members of NECA, not just these petitioners. Further, if the 48 NECA members have already paid the legal bills, it would be inappropriate to award 100% of the fees to the petitioners before this court.

The ALJ stated that "[t]he employer-members paid a share of the legal expenses based on the number of employees as a percentage of the number of employees in the total bargaining unit." Thus, the fees may have already been paid. If so, it is not clear whether they were paid by NECA out of its regular dues-supported funds, or whether the individual NECA members paid the fees through a special assessment. Further, the ALJ record does not make clear whether the fees have been paid; the Excerpts of Record provided by the applicants show copies of bills, but do not indicate whether those bills have been paid.

If the bills have not yet been paid, and if the petitioners would use a fee award to pay the entire fee amount, then the Board has no sound basis for finding that a fee award would be "unjust." On the other hand, if the bills have already been paid jointly by all 48 NECA members, as stated by the ALJ, then it would be a windfall to award 100% of the fees to the petitioners.

Upon remand the Board should be able readily to determine who paid, to whom and how much and make the award accordingly, so that no one is denied actual costs and no one receives a windfall.

PETITION GRANTED.