82 F.3d 423
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
RELIGIOUS TECHNOLOGY CENTER; Church of Scientology of
California; Church of Scientology International,
Plaintiffs-counter-defendants-Appellees
v.
Robin SCOTT, et al., Defendants,
and
Church of the New Civilization; David Mayo,
Defendants-counter-claimants-Appellants,
Church of Spiritual Technology, Counter-defendant-Appellee.
RELIGIOUS TECHNOLOGY CENTER; Church of Scientology of
California; Church of Scientology International,
Plaintiffs-counter-defendants-Appellants,
v.
Robin SCOTT, Defendant,
Church of Spiritual Technology, Counter-defendant,
and
Church of the New Civilization; David Mayo,
Defendants-counter-claimants-Appellees
 Nos. 94-55781, 94-55920.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 14, 1995.
Decided April 11, 1996.
As Amended on Denial of Rehearing and Rehearing En Banc July
5, 1996.*
 
 1
 Before: HALL and JOHN T. NOONAN, Jr., Circuit Judges, and SHUBB*, District Judge.
 
 
 2
 Dissent by Judge Noonan, on rehearing.
 
 
 3
 MEMORANDUM**
 
 
 4
 Religious Technology Center (RTC), a California corporation, appeals from judgment and imposition of attorneys fees entered against it in two cases it brought against David Mayo (Mayo) and other related defendants. Mayo cross-appeals judgment entered against him on his counterclaims. We affirm the judgment and award of attorneys fees against RTC. We affirm the dismissal of Mayo's emotional distress and false designation of origin counterclaims, but reverse and remand the judgment against Mayo on his remaining counterclaims.
 
 PROCEEDINGS
 
 5
 In January 1985 RTC sued Mayo and other persons connected with the Church of the New Civilization, a splinter group of the official Church of Scientology, contending that they were making unauthorized use of stolen documents relating to the religion of Scientology. RTC stated that it was "the protector" of the religion of Scientology, its philosophy and its technology "including the Advanced Technology" consisting of "confidential and proprietary information regarding counseling and training," and was the owner of various trademarks registered with the U.S. Patent and Trademark Office protecting the Advanced Technology. The coplaintiffs with RTC were the Church of Scientology International, Inc. and the Church of Scientology of California, Inc., both nonprofit California corporations which RTC stated were authorized by it to use the Advanced Technology in accordance with certain terms and conditions in conjunction with the marks it owns. Thirty-one marks were identified in RTC's complaint, in addition to which there were a number of other marks for which registration was pending or marks owned by RTC but as yet unregistered. RTC sought an injunction against the use of this material by the defendants. In November 1985 RTC filed a second suit, ultimately consolidated with the first.
 
 
 6
 Mayo counter-sued for false designation of origin of the documents and for unfair competition in violation of the Lanham Act, for libel, and for intentional infliction of emotional distress. After 1,825 docket entries and nine years of pretrial litigation involving three discovery magistrates, a special master, the recusal of two district court judges, the denial of five petitions for writ of mandamus, three appeals (Religious Technology Center v. Wollersheim, 796 F.2d 1076 (9th Cir.1986), cert. denied, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987); Religious Technology Center et al. v. Scott, 869 F.2d 1306 (9th Cir.1989); Religious Technology Center v. Wollersheim, 971 F.2d 364 (9th Cir.1992), and three denials of certiorari by the Supreme Court, the third district judge, A. Wallace Tashima, entered Final Judgment. We set out and respond to the issues now raised on these appeals.
 
 I. Recusal of Judge Ideman
 
 7
 RTC first appeals District Judge Letts' denial of its October 1991 motion to recuse Judge Ideman, the district judge assigned to this case after Judge Pfaelzer had recused herself. In denying RTC's petition for writ of mandamus this court in an unpublished order expressly determined that Judge Letts' denial was "not clearly erroneous." This order is the law of the case, to which subsequent panels should defer unless new evidence or law has been presented or unless the first panel's ruling was clearly erroneous. See Merritt v. Mackey, 932 F.2d 1317, 1320 (9th Cir.1991). We find that none of Merritt 's exceptions apply in this case.[1]
 
 II. Rule 37 Dismissal
 
 8
 RTC mounts two attacks on Judge Ideman's dismissal of its claims as a discovery sanction under Rule 37; it argues: (1) that Judge Ideman simply rubber stamped the special master's recommendation to dismiss without conducting an independent review; and (2) that the dismissal order itself was improper under Rule 37. We will discuss these arguments in turn.
 
 A. Rubber Stamping
 
 9
 When the case was referred to District Judge Ideman, it was still in a pretrial stage after four years of litigation. Taking note of the complexity of the litigation (which involved the Copyright Act, the Federal Trademark and Patent Infringement Act), the number of parties to the litigation, the large number of motions and motions for reconsideration already characteristic of the litigation, and the need to reduce to manageable proportions what was estimated to be three months' trial time, Judge Ideman referred the consolidated cases to a retired state judge to act as special master to supervise discovery and law and motions practice.
 
 
 10
 On this appeal, RTC objects to the way the district court treated the special master's recommendations.[2] In other contexts, we have recognized that while a special master should not be given authority to conduct a full trial, he may be given
 
 
 11
 broad authority to supervise and conduct pretrial matters, including discovery activity, the production and the range of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations thereto.
 
 
 12
 Burlington Northern R.R. Co. v. Department of Revenue, 934 F.2d 1064, 1073 (9th Cir.1991) (quoting In re Armco, Inc., 770 F.2d 103, 105 (8th Cir.1985)). At the same time we have observed that a district court's rubber-stamping of a special master's order is unacceptable--even on pretrial matters: "[T]he district court's rubber stamp of the master's order is an inexcusable abdication of judicial responsibility and a violation of article III of the Constitution." Burlington, 934 F.2d at 1072.
 
 
 13
 RTC contends that the district court rubber-stamped the dismissal of RTC's claims as a discovery sanction for noncompliance with court orders. To the contrary, the district court took the position that the special master had no power to order dismissal of the case. In the course of responding to RTC's second petition for mandamus Judge Ideman, on June 21, 1993, filed a declaration with the court ruling in relevant part as follows:
 
 
 14
 3. The past 8 years have consisted mainly of a prolonged, and ultimately unsuccessful, attempt to persuade or compel the plaintiff to comply with lawful discovery. These efforts have been fiercely resisted by plaintiffs. They have utilized every device that we on the District Court have ever heard of to avoid such compliance, and some that are new to us.
 
 
 15
 4. This noncompliance has consisted of evasions, misrepresentations, broken promises and lies, but ultimately with refusal. As part of this scheme to not comply, the plaintiffs have undertaken a massive campaign of filing every conceivable motion (and some inconceivable) to disguise the true issue in these pretrial proceedings. Apparently viewing litigation as war, plaintiffs by this tactic have had the effect of massively increasing the costs to the other parties, and, for a while, to the Court. The appointment of the Special Master 4 years ago has considerably relieved the burden to this Court. The scope of plaintiff's efforts have to be seen to be believed. (See Exhibit "A", photo of clerk with filings, and Exhibit "B", copy of clerk's docket with 81 pages and 1,737 filings.)
 
 
 16
 5. Yet it is all puffery--motions without merit or substance. Notwithstanding this, I have carefully monitored the Special Master's handling of these motions. I saw no need to try to improve on the Special Master's writings if I agreed with the reasons and the results. However, with respect to the major ruling that I have made during these proceedings, the dismissal of the plaintiff's claims, the following occurred:
 
 
 17
 6. The Special Master, after years of efforts to compel compliance with discovery, purported to order a dismissal of plaintiff's claims. Although the action was probably long overdue, the Special Master did not have the authority to make such a dispositive order. In reviewing his order, as I did with all of his actions, I saw what he had done and did not approve it. I treated the Special Master's "order" as a recommendation and gave notice to the parties that they could have a hearing and invited briefs. Only after considering fully the briefs of the parties did I give approval to the dismissal. It is true that I adopted the language chosen by the Special Master, but that was because I fully agreed with his reasoning and saw no need to write further.
 
 
 18
 Judge Ideman's pointed and pungent review of the record is the reverse of a rubber stamp. It is the judge's own heartfelt appraisal of the plaintiffs' actions as meriting dismissal. RTC's claim of violation of the Constitution by unconstitutional delegation fails.
 
 B. Propriety of Dismissal
 
 19
 Dismissals under Fed.R.Civ.P. 37 are reviewed for abuse of discretion. Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 348 (9th Cir.1995). An appellate court should reverse "only if [it has] a definite and firm conviction that [the sanction] was clearly outside the acceptable range of sanctions." Malone v. United States Postal Service, 833 F.2d 128, 130 (9th Cir.1987), cert. denied sub nom. Malone v. Frank, 488 U.S. 819 (1988).
 
 
 20
 Rule 37(b)(2)(C) gives the district court discretion to dismiss a party's claims as a sanction for noncooperation in discovery matters. Fed.R.Civ.P. 37(b)(2)(C). Dismissal is warranted only if the party facing sanctions acted in bad faith. Anheuser-Busch, 69 F.3d at 348. The district court must also weigh several other factors before imposing the "harsh sanction of dismissal":
 
 
 21
 (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.
 
 
 22
 Id. (citation omitted). If the district court makes explicit findings as to these factors, as it did in this case, we need not review the record independently to determine if there was an abuse of discretion. Cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1412 (9th Cir.1990). Notwithstanding our ability to rely on the district court's findings, RTC argues that the dismissal was improper because (1) the district court wrongly denied RTC an evidentiary hearing; and (2) the district court's dismissal was unwarranted because RTC acted in good faith.
 
 
 23
 As to the evidentiary hearing claim, RTC asserts that it did not have certain documents required by discovery so that its compliance was impossible; it contends that it needed an evidentiary hearing to show the nonexistence of the documents. This Circuit has, in dicta, noted that an evidentiary hearing on the matter for which a party is sanctioned might be required before dismissal if the party had sought "to show that it was impossible for them to comply with the discovery orders ..." United States v. Westinghouse Elec. Corp., 648 F.2d 642, 652 (9th Cir.1981); see also Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d 585, 592 (9th Cir.1983) ("When necessary, the district court may hold an evidentiary hearing on a motion for sanctions. Indeed, that method best determines the appropriate sanctions while protecting a party's due process rights."). No court, however, has said that evidentiary hearings are absolutely required prior to a Rule 37 dismissal; thus, the decision whether to hold an evidentiary hearing is well within the court's discretion.
 
 
 24
 The district court in this case did not abuse its discretion because RTC was given full opportunity to demonstrate the nonexistence of the documents. When RTC was notified of the special master's declared intent to impose a Rule 37 dismissal sanction, it moved for an evidentiary hearing. In its supporting papers, RTC argued that a hearing was necessary because witnesses lacked credibility and because the documents subject to production did not exist. We do not find the credibility of Mayo/CNC's witnesses relevant to the sanctions issue, except insofar as it bears on whether the documents RTC refused to produce actually existed. Special Master Kolts, however, had already found that RTC did "not proffer any declarations or other evidence which truly supports [its] suggestion that none of the requested documents exist or existed at the inception of this litigation."; this would seem to foreclose RTC's contention that an evidentiary dispute warranting a hearing existed. Even if we decided not to give the special master's finding the full weight it deserves, Wyle does not make an evidentiary hearing an absolute prerequsiite to a dismissal sanction, even when issues are in dispute. See Wyle, 709 F.2d at 592 ("When necessary, the district court may hold an evidentiary hearing on a motion for sanctions.") (emphasis added). Thus, we do not find that the special master or Judge Ideman abused their discretion in denying a hearing on either the credibility or document-existence issues.
 
 
 25
 Nor did the district court err in rejecting RTC's alternative claim that it acted in good faith and was therefore not deserving of sanctions. RTC claims that it believed that the discovery order it disobeyed was stayed pending a ruling on a related summary judgment motion that would have mooted the discovery order. This claim is not supported by the facts of this case. On July 25, 1990, the district court issued an order requiring discovery of certain documents related to RTC's antitrust claim. On August 8, 1990, RTC filed a motion for review of the district court's July 25 order. RTC then moved for summary judgment on its antitrust claim. On October 31, 1990, the district court continued its consideration of the August 8 review order pending the master's resolution of RTC's summary judgment motion; the continuance lasted until January 7, 1991. On April 26, 1991, the master reordered discovery (and did not mention the district court's October 31 order). On August 12, 1991, the district court ordered RTC to comply with the discovery order. On April 17, 1992, the master dismissed RTC's claims for violation of the August 12, 1991 and other discovery orders.
 
 
 26
 RTC claims that it believed it did not have to comply with the July 25, 1990 discovery order because of the district court's October 31, 1990 continuance. Even if that were true, the continuance ended on January 7, 1991--and RTC was reminded of its obligation to follow the order on April 26. Thus, RTC's confusion should have been dispelled.
 
 
 27
 RTC further argues that the master's April 17, 1992 dismissal order was tainted because it rested on the August 12, 1991 order; the August 12 order, RTC contends, was wrong because it ignored the earlier October 31 order. As we find the August 12, 1991 order proper, the April 17, 1992 dismissal is affirmed.
 
 III. Attorneys Fees
 
 28
 RTC also challenges the district court's order awarding Mayo almost $2.9 million in attorneys fees on two grounds: (1) that the order was a mere rubber stamp of the special master's ruling; and (2) that the district court abused its discretion in awarding fees at all.
 
 A. Rubber Stamping
 
 29
 The facts are as follows: On January 20, 1993, the special master awarded attorneys fees, first under the Lanham Act finding the case exceptional because the plaintiffs "have abused the federal court system by using it, inter alia, to destroy their opponents, rather than to resolve an actual dispute over trademark law or any other legal matter." The master also awarded fees pursuant to the Copyright Act, 17 U.S.C. § 505, finding that the plaintiffs' complaints had been brought "in bad faith" to harass the individual defendants and destroy the church through massive over-litigation and other highly questionable litigation tactics." The master also awarded fees pursuant to the court's inherent authority to award fees when the losing party has acted in bad faith. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 258 (1975). Finally, the master declined to base the attorneys fees award on California contract law because "California contract law might collide with the first amendment in this particular context."
 
 
 30
 The master made a succinct statement as to the fees requested, noting that "many attorneys worked many, many hours on this case"; that the hours were reasonable "given the plethora of constitutional issues, discovery stand-offs, appeals, and, most importantly, plaintiffs' practice of endlessly litigating issues"; and that the hourly rates were reasonable for federal civil practice within the Central District of California. The master recommended an award of $2.9 million.
 
 
 31
 The plaintiffs appealed to the district court, which denied their appeal on February 24, 1993. The district court stated that it had reviewed the extensive record and found among other things evidence of the plaintiffs' destruction and concealment of documents, refusal to comply with many court orders, needless delay and multiplication of the proceedings by the plaintiffs, and their filing of frivolous motions and of offensive and unreasonable motions. As a result of these findings the court concluded that the plaintiffs should be assessed fees under the Lanham Act and the Copyright Act. The court ignored the master's recommendation as to California contract law and awarded the defendants fees "as the prevailing parties pursuant to contract." The court also concluded that RTC should be assessed attorneys fees for their bad faith litigation conduct. Comparing the district court's rulings of law with the recommendations of the special master, we note that the district court disagreed with the special master on one issue and agreed with the special master on three issues.
 
 
 32
 The district court also stated that it had reviewed the declarations and exhibits supporting the amount and reasonableness of the attorneys fees; that it considered "the novelty and complexity of the issues" involving the RICO, Lanham and copyright issues and pendent state questions, including breach of contract and trade secrets, the multiple requests for injunctive relief, the several appeals to the circuit court and the volume of the issues producing a court file "well in excess of 100 volumes." The court found that defense counsel had acted reasonably in response to a case in which they were confronted by claims for $2 million plus punitive damages and a request for permanent injunctive relief against their clients; counsel had secured for their clients a dismissal of all the plaintiffs' claims in their entirety. Only after this review did the district court substantially adopt the recommendation of the special master as the amount of fees to be awarded. The district court's action cannot fairly be characterized as rubber-stamping.[3]
 
 B. Propriety of Fee Award
 
 33
 To uphold a fee award, we must find a concise but clear explanation of the fee award, which will allow us to determine whether or not the court below abused its discretion in awarding fees. Cunningham v. City of Los Angeles, 879 F.2d 481, 485 (9th Cir.1988); D'Emanuele v. Montgomery Ward & Co., Inc., 904 F.2d 1379, 1386 (9th Cir.1990). This explanation must: (1) set out the reasonable hourly rate and reasonable number of hours spent on the matter, and explain those numbers (this is the "lodestar" amount, and is presumed reasonable; see D'Emanuele, 904 F.2d at 1383); (2) discuss any relevant Kerr factors used to adjust the "lodestar" amount, although all the factors need not be addressed (these factors come from Kerr v. Screen Actors Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975)); and (3) if detailed records submitted by the winning attorney are rejected, explain the reasons for the rejection. D'Emanuele, 904 F.2d at 1386.[4]
 
 
 34
 The record shows that the explanation of the fee award satisfies all of these requirements. At the special master's level, the lodestar amount was properly calculated and specifically explained in light of the Kerr factors. In making the lodestar calculation, the special master explicitly reached the following conclusions: that the number of hours submitted by the defendants (totalling at least 22,155.71 attorneys' hours) was reasonable taking into consideration the number of attorneys working on the case, the number of issues involved, the appeals, the discovery standoffs, and RTC's practice of repeatedly litigating issues, including up to ten petitions to stay the attorneys fee ruling; and that the hourly rate was reasonable as well, given the rates normally charged by attorneys practicing in the Central District of California ($90 to $185 per hour for associates, $150 to $300 per hour for partners, $50 per hour for paralegals and law clerks).
 
 
 35
 The materials submitted to support Mayo/CNC's fee request included detailed declarations of counsel. These declarations referenced hundreds of pages of contemporaneously prepared and filed time records reflecting work actually and necessarily performed and billed, as well as affidavits and other evidence. The records submitted by RTC contested the validity of Mayo/CNC's submissions and referenced numerous attached exhibits purporting to document discrepancies in Mayo/CNC's billing records.[5] The district judge readdressed these concerns and also took into account other Kerr factors, such as the fact that the litigation involved a large amount of money, including potential punitive and injunctive relief, and the fact that Mayo/CNC's attorneys were successful in all the matters for which they were seeking fee reimbursement. We therefore conclude that the district court did not abuse its discretion in awarding fees.[6]
 
 
 36
 IV. Mayo's Counterclaims.
 
 
 37
 a) Libel
 
 
 38
 Mayo's libel counterclaim is based on statements in a publication titled "Squirrels" allegedly circulated by RTC in Scientology and CNC circles. The publication identifies Mayo and other CNC officials as having offered "false testimony to the IRS" and having attempted to "shift attention from ... their crimes." Mayo contends that the statement is false and that the publication was intended to reach Scientologists and non-Scientologists. RTC does admit this statement is "an accusation of criminal acts" but that it was intended only for Scientologists. Based on these contradictory assertions alone, material facts are in dispute and summary judgment was improper.
 
 
 39
 Summary judgment was also improper because Mayo can establish a prima facie case of libel. Mayo has made a showing of damages from the alleged libel, having testified that at least two people terminated economic relationships with Mayo and CNC based on the statements in "Squirrels," although he did not identify a specific amount of damages related to those terminations. Moreover, even if Mayo had shown no damages, RTC's publication of a written statement attributing criminal activity to Mayo is libel per se for which no special damages need be proved. Barnes-Hind, Inc. v. Superior Court, 181 Cal.App.3d 377, 382, 226 Cal.Rptr. 354, 356 (Cal.Ct.App.1986).
 
 
 40
 b) Emotional Distress
 
 
 41
 The district court dismissed Mayo's August 1985 emotional distress claim as untimely under California's one-year statute of limitations. Mayo maintains his cause of action was timely because (1) it was a compulsory counterclaim under Fed.R.Civ.P. 13(a) that related back to RTC's January 1985 complaint; and (2) it was the product of a civil conspiracy whose last act occurred within the year before Mayo filed his emotional distress claim.
 
 
 42
 While it is true that a compulsory counterclaim relates back to the filing of the original complaint, Employers Ins. v. Wausau v. United States, 764 F.2d 1572, 1576 (Fed.Cir.1985), we do not find Mayo's emotional distress claim compulsory. FRCP 13(a) defines a compulsory counterclaim as one "aris[ing] out of the same transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a). Courts making this determination ask whether the "essential facts" of the claims are "logically connected"; this often involves asking whether the resolution of the first claim would moot the counterclaim. Pochiro v. Prudential Ins. Co. of America, 827 F.2d 1246, 1249-51 (9th Cir.1987). In our case, RTC originally asserted claims for trade secret appropriation, unfair competition, false designation, as well as for RICO and trademark violations. Mayo and CNC asserted counterclaims for unfair competition, false designation, libel, and emotional distress. On the one hand, all of the litigation stems from the same factual scenario--the theft and subsequent use of RTC's scriptures. Even so, Mayo's emotional distress claim involves other facts as well (e.g. harassment). Moreover, while RTC's victory on its unfair competition and false designation claims might moot Mayo's mirror claims, resolving RTC's claims would not resolve Mayo's emotional distress claim--which does not deal with who owned the scriptures. Despite the broad definition of "same transaction," Pochiro, 827 F.2d at 1252, we cannot conclude that Mayo's emotional distress claim was compulsory.
 
 
 43
 Mayo alternatively argues that his emotional distress injuries were inflicted as part of a civil conspiracy by RTC so that the limitations period was tolled until the last overt act was completed. "[W]hen a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of the plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed." Wyatt v. Union Mortg. Co., 24 Cal.3d 773, 786, 157 Cal.Rptr. 392, 400 (Cal.1979). Although Judge Pfaelzer concluded that Mayo had properly alleged a conspiracy, she also concluded that he had not properly proved one; Mayo has offered no further proof of the conspiracy. We must therefore affirm the district court's dismissal of Mayo's emotional distress counterclaim.
 
 
 44
 c) Unfair Competition and False Designation of Origin
 
 
 45
 RTC argued that Mayo's unfair competition and false designation of origin claims were not justiciable under the First Amendment because they would require the court to entangle itself in underlying questions of religious doctrine.[7] See Jones v. Wolf, 443 U.S. 595 (1979); Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 725 (1976); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969). The district court agreed, finding that it was Scientology doctrine that L. Ron Hubbard was the "source" of all "Advanced Technology" and that adjudication of the Technology's authorship would undermine this religious doctrine. We do not reach the issue of justiciability, however, because we find RTC estopped from raising the non-justiciability defense.
 
 
 46
 The doctrine of judicial estoppel is invoked to "prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." United States v. Nix, 21 F.3d 347 (9th Cir.1994) (quoting Russell v. Rolfs, 893 F.2d 1033 (9th Cir.1990), cert. denied, 501 S.Ct. 1260 (1991)). The Ninth Circuit has not yet decided on the conditions under which estoppel applies:
 
 
 47
 Under the majority view, judicial estoppel does not apply unless the assertion inconsistent with the claim made in the subsequent litigation "was adopted in some manner by the court in the prior litigation." Under the minority view, judicial estoppel can apply even when a party was unsuccessful in asserting its position in the prior judicial proceeding, "if the court determines that the alleged offending party engaged in 'fast and loose' behavior which undermined the integrity of the court."
 
 
 48
 United States v. Garcia, 37 F.3d 1359, 1367 (9th Cir.1994), cert. denied, 115 S.Ct. 1699 (1995) (quoting Britton v. Co-op Banking Group, 4 F.3d 742, 744 (9th Cir.1993) (quoting In re Corey, 892 F.3d 829, 836 (9th Cir.1989), cert. denied sub nom. Kulalani Ltd. v. Corey, 498 U.S. 815 (1990))).
 
 
 49
 We need not resolve this issue because RTC is estopped under either standard. The pertinent preceding proceedings to examine under the majority rule are stated in RTC v. Scott, supra:
 
 
 50
 The district court granted the Church a TRO and later extended it to a preliminary injunction, prohibiting the New Church from "using, distributing, exhibiting or in any way publicly revealing" the scriptures. RTC v. Wollersheim, 869 F.2d at 1079. The preliminary injunction was based on the district court's finding that the scriptures were trade secrets and entitled to protection under both RICO and California law.
 
 
 51
 On appeal, we vacated the preliminary injunction. We held that the scriptures did not qualify as trade secrets under California law because of the failure of the Church to claim that the scriptures had any commercial value. We rejected the Church's argument that the scriptures qualified as trade secrets because of their spiritual value. Id. at 1090-91.
 
 
 52
 The Church returned to the district court and filed a second Ex Parte Application for Temporary Restraining Order and Order to Show Cause, again asking the court to restrain the New Church from using the scriptural materials. This time, the Church argued that the scriptures qualified as trade secrets because they had economic value. Specifically, the Church contended that if the New Church was not enjoined from using the scriptures, "[p]laintiffs will be forever at a loss to protect the confidential nature and resultant economic value of these materials. Defendant will obtain an economic advantage that they would not otherwise possess which will be used to divert parishioners, the value and goodwill of which cannot be monetarily measured for plaintiffs." Excerpt of Record ("E.R."), Vol. 1:347 at 29. (Emphasis added.) After a hearing, the district court denied the application "solely based upon the Ninth Circuit's ... decision [in Wollersheim ].
 
 
 53
 869 F.2d at 1308. On appeal to this court we held that the district court had interpreted the first opinion too narrowly and remanded the case to the district court to consider whether the Church had an economic interest in its scriptures. Id. at 1310. Consequently, RTC obtained a judicial ruling in its favor by asserting that the status of the scriptures was an economic matter justiciable in the courts. Because the ruling on remand adopted RTC's prior position that it had a justiciable, economic interest in the Advanced Technology, RTC is estopped under the majority view.
 
 
 54
 Moreover, there is little doubt that RTC is playing "fast and loose" with the judicial system as required in the minority view of estoppel. To first assert that its unfair competition and false designation of origin claims are justiciable and at the same time assert that Mayo's identical claims are not is at best questionable; in light of RTC's documented history of vexatious behavior, RTC's actions are indefensible. While we will not affirm the dismissal of either counterclaim on First Amendment grounds, we will affirm the dismissal of Mayo's false designation of origin counterclaim. It is well established that a party who created a document under a work-for-hire basis cannot entertain an action for false designation of origin. See Cleary v. News Corp., 30 F.3d 1255, 1259-60 (9th Cir. 1994). In his order dismissing Mayo's counterclaims, Judge Tashima found that "[t]he prior work-for-hire doctrine ruling effectively foreclosed any rights on Mayo's part to make any claims of authorship or ownership regarding the NOT materials." This finding forecloses Mayo's false designation of origin counterclaim.
 
 
 55
 Accordingly, the judgment of dismissal of RTC's case and the award of attorneys fees are AFFIRMED, the judgment against Mayo on his emotional distress and false designation of origin counterclaims is AFFIRMED, and the judgment against Mayo on the remaining counterclaims is REVERSED and the case REMANDED.
 
 NOONAN, dissenting:
 
 56
 I would grant an evidentiary hearing on the existence or nonexistence of the documents RTC was charged with producing. I do not find that any district judge actually adopted Magistrate Kolts' work-for-hire ruling. Accordingly I vote to grant the petition for rehearing.
 
 
 57
 NOONAN, Circuit Judge, concurring separately.
 
 
 58
 JUDGE NOONAN concurs in the result.
 
 
 
 *
 Judges Hall and Shubb have voted to deny appellant's petition for rehearing. Judge Hall has voted to reject the suggestion for rehearing en banc and Judge Shubb recommends rejection
 
 
 *
 The Honorable William B. Shubb, United States District Judge for the Eastern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Even if Judge Letts mistakenly applied a subjective standard under § 544, so that the law of the case doctrine only applies to the first panel's conclusion that Judge Ideman was not subjectively biased, we independently conclude that Judge Ideman's recusal was also not mandated under § 544(a)'s objective test
 
 
 [2]
 RTC does not in this appeal challenge Judge Ideman's initial reference of this litigation's pretrial matters to the special master. RTC's two previous attempts to do so failed and we are given no reason to abandon our prior decisions
 
 
 [3]
 We also reject RTC's argument that Judge Ideman adopted in toto the Findings of Fact and Conclusions of Law proposed by defense counsel (with the exception of striking the word 'Proposed' that preceded 'Findings'). While we have observed that such a practice is 'regrettable' and might therefore warrant reversal, see Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1385 n. 3 (9th Cir. 1984), this is not such a case. Although the order which Judge Ideman ultimately signed was submitted by the victorious defense attorneys, the Findings of Fact incorporated therein as to the reasonableness of the hours spent and the $2.9 million fee award were made by the Special Master--and not Mayo's attorneys. Thus, Sealy's rule of reversal does not apply
 We find RTC's other claims of rubber-stamping equally meritless.
 
 
 [4]
 Because the district court in this case was not rejecting detailed and accurate time sheet records submitted by winning counsel, we need not address this last factor
 
 
 [5]
 Because both parties submitted numerous affidavits and briefs, the district court had a sufficient factual basis upon which to rest its fee award. An evidentiary hearing was therefore unnecessary. See Sablan v. Department of Finance of N. Mariana Islands, 856 F.2d 1317, 1322 (9th Cir. 1988) (noting that an evidentiary hearing is not necessary where the "record and supporting affidavits are sufficiently detailed to provide an adequate basis for calculating an award."); D'Emanuele v. Montgomery Ward & Co., Inc., 904 F.2d 1379, 1389 (9th Cir. 1990) (same)
 
 
 [6]
 We also reject RTC's argument that the district court erred in awarding fees under the American rule without making a finding that RTC's claims were objectively frivolous. In this Circuit, a court awarding fees unde the American rule need only find that a litigant acted in "bad faith." See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc., 890 F.2d 165, 175 (9th Cir. 1989) ['(A] court may assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.") (citations and internal quotations omitted); Association of Flight Attendance v. Horizon Air Indus., Inc., 976 F.2d 541, 548 (9th Cir. 1992) (setting down American rule for attorneys fees without mentioning a frivolity requirement); Todd Shipyards Corp. v. Cunard Line, Ltd., 943 F.2d 1056, 1064-65 (9th Cir. 1991) (same); Cf. Martel v. County of Los Angeles, 34 F.3d 731, 739 (9th Cir. 1994), withdrawn in part on reh'g by, 56 F.3d 993 (9th Cir.), cert. denied, 116 S. Ct. 381 (1995) (requiring a finding of objective frivolousness for fees on appeal under Federal Rule of Appellate Procedure 38 and 42 U.S.C. § 1988)
 That Mayo himself did not pay his attorneys fees is irrelevant where, as here, the fees are not awarded under the Equal Access to Justice Act. See Grason Elec. Co. v. NLRB, 951 F.2d 1100, 1106 (9th Cir. 1991) (not permitting fees to be awarded under EAJA when a third party footed the bill); cf. Pickering v. Holman, 459 F.2d 403, 407-08 (9th Cir. 1972) (awarding fees to a party in patent litigation even though his litigation was paid for by another party).
 
 
 [7]
 RTC also argues that Mayo's unfair competition counterclaim rests solely on Cal.Bus. & Prof.Code §§ 17200 et seq. which precludes an action for damages. Because RTC raises this issue for the first time on appeal, we decline to consider it. E.W. French & Sons, Inc. v. General Portland, Inc., 885 F.2d 1392, 1402 (9th Cir.1989)