**VOLCAN GROUP, INC., d/b/a Netlogix, a California corporation, Plaintiff,**

v.

**T–MOBILE USA, INC., a Delaware corporation, as successor by merger to Omnipoint Communications, Inc., Defendant.**

Case No. 2:10–cv–00711–RSM.

United States District Court,
W.D. Washington,
at Seattle.

March 14, 2012.

Dennis Michael Moran, William Arthur Keller, Moran Windes & Wong, Seattle, WA, for Plaintiff.

Cassandra L. Kennan, James C. Grant, Stephen M. Rummage, Davis Wright Tremaine, Michael E. Kipling, Kipling Law Group PLLC, Seattle, WA, for Defendant.

RICARDO S. MARTINEZ, District Judge.

This matter comes before the Court on Defendants' motion to dismiss as a sanction for Plaintiffs' spoliation of evidence. Dkt. # 58. The Court has reviewed the motion, Plaintiffs' response, Defendants' reply, Plaintiffs' supplemental response, Defendants' supplemental reply, along with additional supplemental briefing from

each party. The Court also conducted an evidentiary hearing at which counsel examined a relevant witness, Dkt. ## 158, 160, in addition to hearing oral argument. Having carefully reviewed and considered all of the foregoing, in addition to all documents submitted in support thereof, the Court hereby **GRANTS** the motion and **DISMISSES** this action **WITH PREJUDICE.**

## I. *BACKGROUND*

### A. *Legal Claims*

This case involves a contract dispute between Plaintiff Volcan Group, Inc., d/b/a Netlogix ("Plaintiff") and T–Mobile USA, Inc. ("Defendant"). Defendant hired Plaintiff to perform services in connection with the build out of Defendant's cellular phone network in California, and the parties entered into a written agreement covering that work. Although Plaintiff contends that Defendant breached the written agreement by failing to pay the amounts due thereunder, Defendant claims that the parties modified the written agreement with respect to pricing, and that pursuant to that modification Plaintiff has been paid all it was owed.

Specifically, even though the written agreement sets forth the amounts that would be due thereunder, the parties engaged in an extensive course of dealing that involved invoicing and payment for Plaintiff's services at rates that were lower than those specified in the contract. While Defendant claims that this course of dealing reflects an oral modification to the agreement, Plaintiff asserts that its agreement to charge lower rates was contingent upon Defendant awarding four additional contracts to it, and that Defendant's failure to do so warranted an upward adjustment to all of the bills previously issued.

On June 8, 2009, Defendant informed Plaintiff that it intended to terminate the agreement between the parties. Plaintiff responded by re-issuing invoices to Defendant at the higher rates specified in the agreement, asserting that Defendant had an outstanding balance, pursuant to the higher billing rates, of over $28 million. When Defendant refused to pay these re-issued invoices, Plaintiff initiated this action, asserting claims for breach of contract, promissory estoppel, and unjust enrichment.

### B. *Phone Calls Between Jason Dillon and Defendant's Counsel*

On August 24, 2011, approximately a year and a half after Plaintiff commenced this action, Plaintiff's former Vice President, Jason Dillon ("Dillon"), contacted Defendant's counsel via email to inform them that he had recently resigned from Volcan, and to express his desire to speak with them regarding "the facts of the case." Defendant's counsel scheduled a phone call with Dillon for the following day, and arranged for a court reporter to transcribe the call. Although Defendant's counsel informed Dillon that an "assistant" would be "writing stuff down" in lieu of counsel "taking notes," Defendant's counsel did not explicitly inform him that a court reporter would be transcribing the conversation. During the call, which lasted approximately eighty-one (81) minutes, Dillon made various unsworn statements that, if true, demonstrate spoliation of evidence and other improper behavior.

The Court summarizes the most alarming portions of the call:

- *Plaintiff's Financial Condition:* T–Mobile employee Daniel Swaine told Plaintiff's principal, Scott Akrie, that T–Mobile would not award the contract at issue to a company that had less than $10–$20 million in assets. Although Plaintiff had "no money" at that time, Akrie and fellow Volcan employee Eric De Versa created "fake

books to make it look like they were a bigger company."

- *The Initial Contract:* Although Defendant initially told Plaintiff that it would not be awarded the contract at issue, Plaintiff ultimately secured the contract after delivering $7,500 to Swaine and fellow T–Mobile employee Jay Meyer. Dillon described the transaction in detail, including (1) Akrie's deposit of the money into Dillon's personal bank account, (2) Dillon's withdrawal of that money in cash, and (3) Dillon's subsequent meeting with Swaine and Meyer at a restaurant near Defendant's offices in Concord, CA, at which time Dillon "bought" the contract on Plaintiff's behalf.

- *The Additional Contracts:* The parties discussed entering into four additional contracts, and Swaine demanded that Plaintiff pay him an additional $25,000 to $30,000 in order to secure them. Although Dillon personally delivered $5,000 of this money to Swaine in order to secure one such contract, Defendant awarded it to another company. While Akrie and Dillon were in the process of discussing the possibility of additional payments to Swaine, Defendant terminated Swaine's employment and did not award Plaintiff any additional contracts.

- *The Notebook:* During Plaintiff's relationship with Defendant, Dillon created a set of handwritten notes reflecting, among other things, conversations with Swaine regarding the four additional contracts. At the direction of Akrie, Dillon copied certain information from those notes into a new notebook, and then threw away the old notes. Dillon told Defendant's counsel that Akrie "wanted nothing in [Dillon's notes] related to any other dealings other than what would support a lawsuit against T–Mobile," and that Dillon therefore omitted from the new notebook any notes that hurt Plaintiff's case, while including in the new notebook additional notes that helped Plaintiff's case.

- *Purged Emails:* Akrie reviewed Plaintiff's electronic documents, including emails, prior to Plaintiff's production of such documents in this case. When Plaintiff eventually produced electronic documents, Dillon noticed that certain emails were not included. Dillon stated, for example, that he and Akrie exchanged "quite a few" emails regarding Swaine's demand for a kickback. Although Dillon inquired about those documents, he was told by others at Volcan that the emails in question were "not there" anymore. In addition, although Plaintiff used a third-party web hosting company (Go Daddy) to host its emails during the pendency of the contract, Akrie cancelled that account because he "didn't want anybody to go back [to Go Daddy] and track the emails."

- *California Computers:* Through Craigslist, Akrie sold between three and eight computers used by Plaintiff in connection with its work for Defendant. Akrie sold those computers in October or November of 2009, after Plaintiff had begun contemplating a lawsuit against Defendant. Dillon stated that those computers, which were kept in Plaintiff's northern California office, contained relevant information.

- *Maintenance of Separate Files; Merging of Files:* Plaintiff maintained two separate sets of files in connection with the T–Mobile account: one "active" file based upon the revised (lower) prices, and a separate file based upon the original (higher) prices. After commencement of the lawsuit, and at Akrie's direction, Plaintiff "merged" the two sets of files and

discarded documents reflecting the lower pricing.

- *Agreement Regarding Litigation Proceeds:* In June of 2009, Akrie offered Dillon "10 percent of the profit of this lawsuit" in exchange for his continued "support."
- *Miscellaneous:*
  * Dillon stated that Plaintiff began contemplating a lawsuit against Defendant in June of 2008.
  * Dillon estimated that Plaintiff never performed any work with respect to half of the $28 million that Plaintiff seeks to recover in this case, and that invoices ostensibly reflecting such claims are "just made up."
  * Dillon stated that, during his employment with Volcan, he was coached to say things that were not true in connection with this lawsuit.
  * In explaining why he had reached out to Defendant's counsel, Dillon stated that he "just felt it was best I call you guys and clear my conscience so you guys know truly what happened with everything. And, you know, Scott's going to be pissed, and I'm sure he's going to try to sue me, whatever, but he's already made a comment that if I contacted you guys, you know, that's going to be your choice."

During the August 25 call, Dillon offered to provide Defendant's counsel with a written declaration regarding the various statements he had made. On September 1, 2011, Defendant's counsel provided Dillon with such a draft declaration. Dkt. # 62–15, Ex. FF.[1]

Dillon and Defendant's counsel had a second phone call on September 16, 2011 that lasted approximately forty-five (45) minutes, and that call was also transcribed.[2] During the September 16 call, Dillon stated, among other things, (a) that although Meyer never promised Plaintiff contracts in exchange for money, he was nevertheless "supporting [Swaine's] bribery to us," (b) that Defendant "definitely didn't get the full story" regarding the claims at issue in the case, and that Defendant "only got the parts that we were kind of coached on telling," and (c) that Dillon and others were instructed to keep quiet regarding "documents and files and materials that [had been] thrown away," Akrie's promise to pay Dillon a portion of the litigation proceeds, and the true state of Plaintiff's financial affairs.

During the September 16 call, Dillon also confirmed that he had reviewed the draft declaration prepared by Defendant's counsel, and that it was accurate in all respects save for one. Specifically, as to the issue of document preservation, Dillon stated that "we were told by our attorneys to preserve everything, but it was [Akrie's] decision not to preserve everything." Dillon stated that if Defendant's counsel corrected the draft declaration with respect to that one inaccuracy, he would sign and return it to them within two days. Defendant's counsel made the requested changes and submitted the revised draft to Dillon later that day.

---

1. That draft declaration included statements regarding (1) Plaintiff's maintenance of separate files/merging of files/destruction of documents reflecting revised pricing, (2) Dillon's destruction of his old notebook and creation of the new notebook, (3) Akrie's sale of company computers through Craigslist, (4) Akrie's apparent destruction of email files, (5) the absence of document preservation instructions, and (6) Akrie's promise to pay Dillon a portion of the litigation proceeds in exchange for his "support." *Id.*

2. The transcripts of the August 25 and September 16 calls are collectively referred to herein as the "Transcripts."

Dillon did not, however, sign and return the revised declaration as promised. Instead, on September 26, Dillon sent an email to Defendant's counsel, copied to Akrie, stating as follows: "After carefully reading the incomplete declaration your law firm prepared I am unable to sign it." Dkt. # 62–17, Ex. JJ. Although Dillon characterized the declaration as merely "incomplete," he sent a drastically different message to Akrie the following day, claiming that Defendant's counsel "completely changed our conversation to solely benefit T–Mobile and put blatant lies in the declaration and asked me to sign it." Dkt. # 115. Prior to that email exchange, the record reflects that Dillon and Akrie had already spoken on the phone and engaged in other email correspondence regarding the draft declaration. *See* Dkt. # 104, ¶ 4. In one email, Akrie told Dillon that he "will not forget" that Dillon had reached out to him regarding the draft declaration. Dkt. # 115.

### C. The Spoliation Motion

On October 6, 2011, Defendant filed the instant motion to dismiss as a sanction for Plaintiff's spoliation of evidence. Dkt. # 58. The motion is based largely, although not entirely, upon the unsworn statements made by Dillon to Defendant's counsel during the August 25 and September 16 telephone calls. Defendant attached to its motion redacted excerpts from the Transcripts,[3] and the Court later ordered it to produce complete un-redacted versions.

In response, Dillon submitted a sworn declaration in which he stated that the Transcripts do not "accurately depict the

**3.** Defendant redacted and/or omitted, among other things, any and all statements regarding Plaintiff's alleged "purchase" of the contract at issue.

**4.** After conducting a brief hearing on February 2, it became clear that Dillon was not

conversation" he had with Defendant's counsel. Dkt. # 144, at 4. Dillon did not, however, identify any specific statement as being inaccurate. Given the relevance of the Transcripts to the pending spoliation motion, and given the apparent dispute regarding their accuracy, the Court scheduled an evidentiary hearing at which counsel would be given an opportunity to examine Dillon under oath as to whether he made the statements in question. Dkt. # 149.

### D. The Evidentiary Hearing

The Court conducted an evidentiary hearing on February 2 and 16, 2012.[4] In advance of that hearing, Dillon provided counsel and the Court with a modified version of the Transcripts in which various statements he wished to "disavow" were shown in highlighting. While Dillon admitted that the Transcripts accurately reflect what was actually said during the two phone calls, he claimed that approximately half of the statements attributed to him— i.e., the ones shown in highlighting—were "made out of frustration," "taken out of context," "exaggerated," and/or "untrue." Dillon claimed that he made the statements in question because he was "frustrated" with Akrie over an ongoing dispute about money.

Although Defendant's counsel attempted to determine which statements were "untrue," as opposed to merely "exaggerated," "taken out of context," or "made out of frustration," Dillon stifled that effort by testifying in a manner that was objectively vague, evasive, and inconsistent. The following colloquy is illustrative:

prepared to offer complete testimony as to which portions of the Transcripts he believed did not "accurately depict the conversation" he had with Defendant's counsel. As a result, the Court continued the hearing so that Dillon would have adequate opportunity to prepare for such testimony.

Q: So when you told Mr. Grant, on page 27, "Scott is going to be pissed. I'm sure he's going to try to sue me. But he's already made a comment that if I contacted you guys, you know, that's going to be your choice." So you made that up?

A: Is it highlighted?

Q: It's highlighted.

A: Okay. So, comment made out of frustration.

Q: When you say, "Comment made out of frustration," let me ask you, because that can mean a lot of things. I can be frustrated and tell the truth, or I can be frustrated and tell something that's false. Which is this?

A: It is a comment made out of frustration that I made assumptions on, and comments on, that were not exactly accurate. I exaggerated the answer.

Q: When you say you exaggerated the answer, did Scott say something like this, that you exaggerated, or did you make this up?

A: It was a comment made out of frustration.

Q: Yeah, I hear that. And that doesn't answer my question.

A: You're going to get the same answer, so I wouldn't waste your time about getting upset.

Feb. 16 Hearing Tr., at 30:1–22.

Dillon was also examined regarding the draft declaration Defendant's counsel asked him to sign. According to Dillon, he told Defendant's counsel that he would sign the draft declaration only because he wanted them to stop calling and emailing him. Dillon testified that he never had any actual intention of signing the draft declaration, and that he had not even read the draft declaration at the time he purported to confirm its accuracy.

## II. *ANALYSIS*

### A. *Legal Standard*

■ There are two sources of authority under which a district court may sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who "fails to obey an order to provide or permit discovery." *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337–38 (9th Cir.1985); Fed.R.Civ.P. 37(b)(2)(C). Because the misconduct at issue in this case encompasses more than mere discovery abuse, the Court will assess the propriety of sanctions under its inherent power. *See Tilton v. The McGraw–Hill Companies, Inc.*, Case No. C06–0098RSL, 2007 WL 777523, *6, 2007 U.S. Dist. LEXIS 17421, *19 (W.D.Wash. March 9, 2007).

■ "It is well settled that dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings: Courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir.1995) (internal citations omitted). One reason courts possess such inherent authority is because "[t]here is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result." *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir.1998).

■ Before imposing the "harsh sanction" of dismissal, however, district courts are directed to consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of

prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* Although courts are obligated to carefully examine all of the factors set forth in *Anheuser-Busch,* "the list of factors amounts to a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof." *Valley Eng'rs Inc. v. Elec. Eng'g Co.,* 158 F.3d 1051, 1057 (9th Cir.1998). Because the first two of these factors will generally favor the imposition of sanctions, and the fourth factor generally cautions against dismissal, "the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston,* 910 F.2d 652, 656 (9th Cir.1990).

■■ While the district court need not make explicit findings regarding each of the *Anheuser-Busch* factors, *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 603 (9th Cir.1988), a finding of "willfulness, fault, or bad faith" is required for dismissal to be proper. *Anheuser-Busch,* 69 F.3d at 348 (citation omitted). "Due process concerns further require that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threaten[s] to interfere with the rightful decision of the case.'" *Id.* (*quoting Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 591 (9th Cir.1983)). Additionally, although district courts must consider "less severe alternatives" than outright dismissal, *Wiltec Guam,* 857 F.2d at 604, "it is not always necessary for the Court to impose less serious sanctions first, or to give any explicit warnings." *Valley Eng'rs,* 158 F.3d at 1057. Indeed, "[i]t is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Anheuser-Busch,* 69 F.3d at 352.

## B. *Discussion*

### 1. *Credibility Assessment*

Because Dillon has presented conflicting evidence regarding a wide range of highly relevant issues, resolution of the instant motion first requires the Court to make a credibility assessment as to which version of events it will believe: the one Dillon originally told Defendant's counsel, or the one Dillon and Plaintiff now tell the Court. For the reasons set forth below, the Court believes that Dillon was telling the truth during his conversations with Defendant's counsel, and that he has not told the truth during his subsequent testimony before the Court. As such, the Court credits the statements made by Dillon in the Transcripts.

Although Dillon initially declared that the Transcripts do not "accurately depict the conversations" he had with Defendant's counsel, Dillon conceded on cross-examination that the Transcripts do, in fact, accurately reflect the statements he made. Dillon nevertheless testified that the statements he made to Defendant's counsel are "exaggerated" and "taken out of context" because he was either not telling the entire truth or simply lying when he made them. In other words, Plaintiff asks the Court to accept the truth of what Dillon says in this instance because he was not telling the truth before. The Court declines to do so.

Dillon has had every opportunity to identify those specific portions of the Transcripts that he claims to be untrue. Indeed, the Court expressly directed him to do so. Dillon has categorically failed to comply with the Court's instruction, attempting instead to obfuscate the record through a pattern of intentionally vague, evasive, and self-serving testimony. Having assessed Dillon's demeanor and credibility on the stand, and considering all of the other evidence before it, the Court

believes that Dillon was telling the truth during his discussions with Defendant's counsel, and that his in-court testimony was little more than a thinly-veiled effort to conceal that fact and discredit his own prior statements.

Moreover, in assessing the veracity of Dillon's conflicting statements, the Court finds it highly relevant to consider *why* Dillon reached out to Defendant's counsel in the first place.[5] There is no dispute that Akrie owed money to Dillon, that Dillon and Akrie had a falling out over the issue, and that prior to speaking with Defendant's counsel, Dillon informed Akrie of his intention to do so. Feb. 16 Hearing Tr., at 30:1–22.

Against this backdrop, there is an inescapable inference that when Dillon reached out to Defendant's counsel, he did so as part of a misguided effort to obtain leverage over his former boss. Indeed, after speaking with Defendant's counsel, Dillon informed Akrie not only that he had done so, but also that Defendant's counsel had asked him to sign the declaration. The threat underlying these communications was clear: unless Akrie came to terms with Dillon, he ran the risk that Dillon would sign the declaration, expose Plaintiff's various discovery abuses, and effectively end the instant litigation. The scheme initially worked: Immediately after Dillon declined to sign the declaration—in an email he copied to Akrie—Akrie responded by telling Dillon what he clearly expected to hear: that Akrie "will not forget" what Dillon had done.

The Court recites these findings in order to underscore a simple point: Dillon's scheme would be of little value unless he was actually telling the truth to Defen-

dant's counsel, as a threat to expose discovery abuses that never occurred, or those that are easily disproved, is nary a threat at all. Indeed, it was the *truth* of Dillon's statements—and Dillon's mistaken belief that he could control whether those statements ended up "in the record"—that promised to give Dillon the leverage he desired.

This conclusion is bolstered by the fact that, during the September 16 call, Dillon confirmed the accuracy of the statements contained in the draft declaration. Although Dillon testified to making that statement without having read the declaration, and then only in an effort to dissuade Defendant's counsel from contacting him further, that testimony is belied by the fact that it was Dillon who proposed specific revisions to the draft declaration—something he could not have done unless he actually read the document. Moreover, the explanation Dillon gave for making the statement in question is nonsensical, as his request that the Defendant's counsel revise and resubmit the draft declaration to him is precisely the outcome Dillon now claims he was seeking to avoid—i.e., further contact from Defendant's counsel.

In sum, the Court finds that Dillon's in-court testimony was wholly incredible, and that the statements contained in the Transcripts are credible. As a result, the Court credits the statements contained within the Transcripts.

### 2. *Spoliation*

Having credited the statements contained within the Transcripts, the Court is confronted with overwhelming evidence of spoliation. Although Akrie has presented multiple declarations denying that Plaintiff

---

**5.** Dillon has already "disavowed" the reason he originally gave for approaching Defendant's counsel—i.e., that he simply wanted to "clear [his] conscience." Although Dillon later claimed that, with respect to his discus- sions with Defendant's counsel, "[t]here was nothing in it for me," Feb. 16. Hearing Tr., at 8:1, the Court finds that testimony to be wholly incredible.

despoiled evidence, those self-serving declarations rely almost entirely upon *ipse dixit*, and are contradicted by substantial evidence.

It is worth noting, however, that portions of the sworn declarations submitted by Dillon and Akrie are consistent with some of the damning statements contained in the Transcripts. As such, even if the Court did not credit the statements made in the Transcripts, it would still come to the conclusion that spoliation of evidence has occurred.

■ For example, Akrie declares that in early 2009, after Plaintiff began contemplating a lawsuit against Defendant, he provided Volcan employees with new notebooks. Dkt. # 104, ¶ 8. Akrie further declared that employees copied "assorted project notes" into those notebooks, and that he was aware of the fact that employees were then destroying their old notes. *Id.* For his part, Dillon declares that he copied various notes into his new notebook and included in that notebook additional information he "remembered when [he] was copying the notes and included for the sake of completeness and accuracy." Dkt. # 107, ¶ 6. Dillon also stated that, after copying his old notes into the new notebook, he too destroyed his old notes. *Id.* As Dillon has testified, the notes at issue concerned his personal dealings with Defendant during the course of their business relationship.

■ Those notes were—at a minimum—potentially relevant to this litigation, and Dillon was not entitled to alter or destroy them. Indeed, "[a] party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.' Moreover, because 'the relevance of … [destroyed] documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir.2006) (citations omitted). Here, Dillon and his colleagues clearly had notice that their old notebooks were potentially relevant to the instant litigation. Discarding those notes therefore constitutes spoliation of evidence. *Leon,* 464 F.3d at 959.

■ In the absence of a satisfactory explanation, tampering with relevant evidence also gives rise to a finding of spoliation. *See Wong v. Swier,* 267 F.2d 749, 759 (9th Cir.1959). Here, Dillon has not provided a satisfactory explanation for altering the notes transcribed into his new notebook. Indeed, one of the central issues in this case concerns the course of dealing between the parties, including the parties' contemporaneous understanding of what their agreement entailed. Against that backdrop, it is totally unacceptable for the Plaintiff's central witness—who worked in an executive role and had day-to-day interaction with the Defendant—to modify his working notes at the same time his employer was preparing to file a lawsuit. *Wong,* 267 F.2d at 759. Dillon's explanation for altering his notes is unsatisfactory, and that conduct also constitutes spoliation of evidence.

### 3. *Integrity of the Judicial Process*

■ Although the Court is deeply troubled by Plaintiff's spoliation of evidence, the Court's biggest concern is the damage this litigation promises to inflict upon the integrity of the judicial process if it is permitted to continue.

Dillon is a key witness—perhaps *the* key witness—in this litigation. In the event the Court permitted this case to move forward, his testimony would be among the most critical evidence considered by the finder of fact. But the record already reflects that Dillon has deliberately and

repeatedly lied to both Defendant's counsel and the Court in the form of informal communications, sworn declarations, and in-court testimony. Along the way, Dillon has exhibited a breathtaking lack of respect for his business partners, the law, this Court, and the judicial process.

Although Akrie has recently decided to characterize his former colleague as a "frustrated, disgruntled ex-employee," Dkt. # 161, at 3, it is clear that Akrie is complicit in Dillon's pattern of dishonesty. Aside from Akrie's willful spoliation of evidence, there is no serious dispute that he also promised to pay Dillon a portion of the litigation proceeds in exchange for his "support" throughout the case.

Under these circumstances, the Court finds no assurance that a trial in this matter would be a fact-finding endeavor. On the contrary, the collective dishonesty of Dillon and Akrie has "undermined the truth-finding function of the Court beyond repair." *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 432 (W.D.Wash.2002), *aff'd*, 78 Fed.Appx. 588 (9th Cir.2003).

Courts in this district have dismissed cases on such grounds. In *Jackson,* for example, the plaintiff "perpetrated a lengthy series of elaborate misrepresentations and lies both to the Court and Counsel." *Id.* at 425. Like Dillon, the plaintiff in *Jackson* submitted a sworn declaration that "contains statements which conflict with statements made by [plaintiff] under oath at other times during the pendency of this litigation." *Id.* at 428. Like Dillon, the *Jackson* plaintiff's "misconduct did not cease" when his initial dishonesty was uncovered. Instead, he "told an ever more elaborate series of lies about his misconduct," which included "perjured state-ments at his deposition, and continued through a sworn declaration and two separate evidentiary hearings." *Id.* at 431–32. Before dismissing the plaintiff's case, the *Jackson* court offered the following insight, apropos of the conduct now before the Court:

> [P]laintiff has been evasive and untruthful at every turn.... Despite [several] opportunities] to come forward and be forthright, [plaintiff] continued to perjure himself. He was once again evasive about [certain relevant issues] and he was patently dishonest about [others]. The Court can conceive of no other sanction [than dismissal] which would promote fairness to all parties in this proceeding.

*Id.* at 432.

The same result follows here for the same reason. Although he has had numerous opportunities to cure his misconduct, Dillon, with the cooperation of Akrie, has instead elected to continue spinning a web of lies, entangling himself and the Plaintiff along the way. After his tortured testimony in court Dillon is now left with no credibility whatsoever. The Court does not hesitate in concluding that such conduct rises to the level of bad faith. *Tilton,* Case No. C06–0098RSL, 2007 WL 777523, *6, 2007 U.S. Dist. LEXIS 17421, *20 ("Plaintiff's lack of remorse and the recency of his wrongdoing further evidence bad faith and cast serious doubt on whether he will change his behavior absent sanctions.").[6] Indeed, the behavior of Dillon and Akrie in conducting this litigation has been deliberately deceptive and utterly inconsistent with the orderly administration of justice. *Anheuser–Busch, Inc.,* 69 F.3d

---

**6.** Although the sanctions imposed by the *Tilton* court stopped short of dismissal, the Court noted that the remedy of dismissal was a "close call" and that lesser sanctions were appropriate because the plaintiff's conduct appeared to be a result of mental illness. *Tilton,* Case No. C06–0098RSL, 2007 WL 777523 at *7, 2007 U.S. Dist. LEXIS 17421 at *21–22. Mental illness is not at issue in this case.

at 348. Although it hardly requires saying, Defendant has been prejudiced by the dishonest conduct of Dillon and Akrie, as it is now clear that they did not, in Dillon's words, "get the full story" regarding the relevant facts. This case must therefore be dismissed.

Neither Defendant nor its counsel should be proud of this result. While the Court does not believe that Defendant's counsel violated Washington law by recording their discussions with Dillon,[7] it is clear that the representations they made to Dillon at the outset of those discussions led him to adopt the mistaken belief that his statements were not being transcribed. The Court believes that Defendant's counsel knew of Dillon's misunderstanding, but intentionally did nothing to correct it. The Court questions whether such conduct can be squared with demanding standards of a lawyer's professional responsibilities under RPC 4.1(a).

But even more troubling is the sordid business relationship that is at the core of this case. Although both parties have attempted to ignore the apparent kickback scheme underlying their relationship,[8] the Court cannot simply ignore evidence of such potentially criminal conduct. While the Transcripts suggest that Swaine was the main beneficiary of the particular kickbacks at issue here, they also suggest that others at T–Mobile knew of and possibly benefitted from kickbacks as well, and that the practice of soliciting and receiving such payments was not confined to those at issue in this case. This improper conduct is highly troubling to the Court, and it should be highly troubling to the parties as well.

Although parties are entitled to zealously pursue legitimate legal claims, the parties to this action and their counsel have stepped over the line. Given the tumultuous history between these parties, the blatant dishonesty underlying the instant motion, and Dillon's role as one of the central witnesses in this case, the Court has every reason to anticipate that further proceedings in this matter would be permeated with "continued deceptive misconduct." *Anheuser–Busch,* 69 F.3d at 352. As such, the misconduct that has come to the attention of the Court is not of a type that can be remedied through the imposition of lesser sanctions. On the contrary, dismissal is the only appropriate remedy.

## III. CONCLUSION

For all of the foregoing reasons, Defendant's motion to dismiss, Dkt. # 58, is **GRANTED.** This case is **DISMISSED WITH PREJUDICE,** and without an award of costs or fees to either party.

---

7. RCW 9.73.030 prohibits a person from recording a "private communication" without the consent of all parties thereto. Although Dillon clearly did not consent to a transcription of his conversation with Defendant's counsel, that is not to say that he intended the call to be "private." On the contrary, Dillon clearly understood that Defendant's counsel intended to use the information he was providing in connection with these proceedings, and Dillon even offered to provide them with a sworn declaration regarding his statements. As such, those statements were not intended to be, and were not in fact, "private."

8. The Court has no doubt that Defendant initially redacted the Transcripts in order to conceal Dillon's statements regarding the kickback scheme.